Eugene Killian, Jr.
The Killian Firm, P.C.
48 Wall Street, 11th Floor
New York, NY 10005
(732) 912-2100

Lisa S. Kantor, admitted *pro hac vice*
Kantor & Kantor LLP
9301 Corbin Ave., Suite 1400
Northridge, CA 91324
(818) 886-2525

Kathryn M. Trepinski, admitted *pro hac* vice
Law Offices of Kathryn Trepinski
8840 Wilshire Boulevard, Suite 333
Beverly Hills, CA 90211
(310) 201-0022

Elizabeth K. Green, admitted *pro hac vice*
Green Health Law, APC
201 N. Brand Blvd., Suite 200
Glendale, CA 91203
(818) 722-1164

Attorneys for Plaintiffs'
Molly C. and Naomi L., on behalf of themselves
and all others similarly situated

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X

MOLLY C. AND NAOMI L., ON BEHALF
OF THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED,

                    Plaintiffs,

-against-

OXFORD HEALTH INSURANCE, INC.

                    Defendant.

-----------------------------------------------------X

1:21-CV-10144-PGG

**DECLARATION OF ELIZABETH K. GREEN IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO EXCLUDE THE OPINION EVIDENCE OF PLAINTIFFS' EXPERT DR. FRANK FOX**

**[FILED WITH REDACTIONS]**

I, Elizabeth K. Green, hereby declare that the following is true and correct to the best of my knowledge:

1.      I am an attorney duly licensed to practice law before all courts in the State of California. I am *pro hac vice* counsel of record for Plaintiffs Molly C. and Naomi L. I have personal knowledge of the following facts and, if called as a witness, I could and would testify competently to the following.

2.      The parties entered into a Stipulated Confidentiality Agreement and Protective Order, dated January 4, 2023 ("Protective Order"). Defendant Oxford Health Insurance, Inc. ("Oxford") designated certain information produced in discovery and deposition testimony as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" pursuant to the Protective Order.

3.      In connection with the Motion for Class Certification, Plaintiffs intended to rely on documents and testimony marked as "Confidential" or "Highly Confidential" by Oxford and, therefore, served a Motion to Seal with respect to those documents.

4.      After serving the Motion to Seal, the parties "met and conferred" and agreed that, instead of filing the documents under seal, Plaintiffs would file them with the redactions requested by Oxford. Plaintiffs' agreement to file the documents with redactions does not mean that Plaintiffs agree that the documents or testimony was properly designated as "Confidential" or "Highly Confidential – Attorneys' Eyes Only" under the Protective Order.

5.      Attached as Exhibit A is the Declaration of Frank Fox, Ph.D., dated December 21, 2023, which contains references to documents or information designated as "Confidential" or "Highly Confidential" by Oxford pursuant to the Protective Order. At the request of Oxford, Plaintiffs have redacted portions of the Declaration.

6.      Attached as Exhibit B is the Supplemental Declaration of Frank Fox, Ph.D., dated February 20, 2024, which contains references to documents or information designated as "Confidential" or "Highly Confidential" by Oxford pursuant to the Protective Order. At the request of Oxford, Plaintiffs have redacted portions of the Supplemental Declaration.

7.      Attached as Exhibit C is a true and correct copy of Oxford's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, dated October 13, 2023, which was designated "Confidential" or "Highly Confidential" by Oxford pursuant to the Protective Order. At the request of Oxford, Plaintiffs have redacted portions of Oxford's Supplemental Responses.

8.      Attached as Exhibit D is a true and correct copy of excerpts from the certified transcript of the deposition of Dr. Frank Fox taken on February 26, 2024.

9.      Attached as Exhibit E is a true and correct copy of excerpts from the certified transcript of the deposition of Oxford witness Lisa Gauthier taken on November 29, 2023, which was designated "Highly Confidential – Attorneys' Eyes Only" by Oxford pursuant to the Protective Order. At the request of Oxford, Plaintiffs have redacted portions of the deposition excerpts.

10.     Attached as Exhibit F is a true and correct copy of the February 20, 2020 Class Action Notice in *Rea v. Blue Shield of California*, Los Angeles Superior Court, Case No. BC 468900.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 7th day of June, 2024 at Glendale, California.

_____
Elizabeth K. Green

# EXHIBIT A

Eugene Killian, Jr.
The Killian Firm, P.C.
555 Route 1 South, Suite 430
Iselin, New Jersey 08830
(732) 912-2100

Lisa S. Kantor, admitted *pro hac vice*
Kantor & Kantor LLP
19839 Nordoff Street
Northridge, CA 91324
(818) 886-2525

Kathryn M. Trepinski, admitted *pro hac* vice
Law Offices of Kathryn Trepinski
8840 Wilshire Boulevard, Suite 333
Beverly Hills, CA 90211
(310) 201-0022

Elizabeth K. Green, admitted *pro hac vice*
Green Health Law, APC
201 N. Brand Blvd., Suite 200
Glendale, CA 91203
(818) 722-1164

Attorneys for Plaintiffs
Molly C. and Naomi L., on behalf of themselves and all others similarly situated

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

MOLLY C. AND NAOMI L., ON BEHALF OF

THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED,

               Plaintiffs,

    -against-

OXFORD HEALTH INSURANCE, INC.,

         Defendant.

--------------------------------------------------------X

1:21-CV-10144-PGG-BCM

DECLARATION OF FRANK
FOX, PH.D., PURSUANT TO
PARAGRAPH 7.b. OF THE MARCH 3,
2023 CIVIL CASE MANAGEMENT
PLAN AND SCHEDULING ORDER
[DOCKET NO. 50]

## DECLARATION OF FRANK G. FOX, PH.D.

My name is Frank G. Fox. I am over 21 years of age. I have personal knowledge of the facts stated in this declaration, and the facts stated in this declaration are true and correct.

### Education and Experience

I have been a consulting economist and have owned and operated my own consulting firm since 1996. I earned my Ph.D. in Economics at the University of Washington in 1977. I began my career in econometric modeling in the defense industry, preparing stochastic forecast models. I moved into health care economics in the early 1980s. Since I have had my own consulting practice, I have provided healthcare planning, statistical analysis and financial consulting to hospitals in the State of Washington and in other parts of the country. I have also been engaged by numerous physician practices as an expert in health economics and financial/statistical modeling.

I have extensive experience with forecasting the need for hospital acute care beds, kidney dialysis centers, heart and liver transplant services, home health and hospice services, ambulatory surgery cases, clinical procedures such as GI procedures, cardiac surgery, epilepsy procedures, etc., and evaluating financial performance of health care entities. I have prepared simulation models for healthcare organizations to forecast utilization and financial performance for technologies such as MRIs, linear accelerators, minimally invasive surgery, and for discrete projects such as new hospitals, ambulatory surgery centers, urgent care centers, imaging centers, and emergency departments. I have also prepared business plans for many hospital services and programs.

### Recent Litigation Experience,

Depositions, Expert Declarations, Expert Reports, Rebuttal Reports and Depositions. I have provided expert declarations and/or expert reports and rebuttals in the following cases since 2019: (1) In May 2019, I provided a Declaration regarding models estimating utilization and cost

1

for selected treatments for patients with mental health and substance abuse diagnoses in *Ames v. Anthem Blue Cross Life & Health Insurance Company*, Los Angeles Superior Court Case No. BC591623. (2) In May 2019, I provided Declaration regarding estimates of the number of Plan insureds with Autism Spectrum Disorder ("ASD") who utilized and expended monies for Applied Behavioral Therapy ("ABA") in *JR v. CHI et.al.,* United States District Court, Western District of Washington, Seattle, No. 2:18:cv-01191-JLR. (3) In June 2019, I prepared an Expert Report in *DT v. NECA/IBEW Family Medical Plan, Civil Action No. 2:17-cv-00004 (RAJ)*, which estimated utilization and expenditures for ABA and/or Physical Therapy ("PT"), Occupational Therapy ("OT") or Speech Therapy, for Plan insureds with ASD. (4) In July 2019, I prepared Rebuttal Reports in *DT v. NECA/IBEW Family Medical Plan, Civil Action No. 2:17-cv-00004 (RAJ)*. (5) In January 2020, I provided a Declaration valuing coverage for residential treatment for insureds with eating disorders in a class action case in *Rea v. Blue Shield of California*, *Los Angeles Superior Court Case No. B468900*. (6) In July 2020, I prepared an Expert Report in *Crosby v. Blue Shield of California, Magellan Health, et. al., Case No.: 8:17-CV-01970-CJC-JDE.* (7) In August 2020, I prepared a Rebuttal Report also for *Crosby v. Blue Shield of California, Magellan Health, et. al., Case No.: 8:17-CV-01970-CJC-JDE.* (8) In October 2020, I prepared a Declaration in support of a motion for summary adjudication of Health Net's fifth cause of action for intentional interference with contractual relations in *Dual Diagnosis Treatment Center Inc., v. Health Net, Los Angeles Superior Court, Case No. LC104357*. (9) November 2020, I provided a supplemental Declaration in *Rea v. Blue Shield of California, Los Angeles Superior Court Case No. B468900*. (10) In January 2022, I was deposed in *Dual Diagnosis Treatment Center Inc., v. Health Net, Los Angeles Superior Court, Case No. LC104357*. (11) In June 2022, I was deposed in *Decision by the Department of Health Regarding Two Certificate of Need Applications Proposing to Establish Medicare and Medicaid Certified Hospice Services in Thurston County, No. M2021-923*. (12) In August 2022, I provided a Declaration *in C.P. v. Blue Cross Blue Shield of Illinois, Federal District Court, Western District of Washington, No.3:20-cv-06145-RBJ.* (13) In August 2022, I provided an Expert report *in C.P.*

*v. Blue Cross Blue Shield of Illinois, Federal District Court, Western District of Washington, No.3:20-cv-06145-RBJ.* (14*)* In September 2022, I was deposed in *C.P. v. Blue Cross Blue Shield of Illinois, Federal District Court, Western District of Washington, No.3:20-cv-06145-RB.* (15) In January 2023, I prepared a Declaration in *Schmitt v. Kaiser Foundation Health Plan of Washington, Kaiser Foundation of Washington Options Inc., Kaiser Foundation Health Plan of the Northwest and Kaiser Foundation Health Plan, Inc, Western District of Washington, No. 2:17-cv-01611-RSL.* (16) In May 2023, I prepared an Expert Report in *Schmitt v. Kaiser Foundation Health Plan of Washington, Kaiser Foundation of Washington Options Inc., Kaiser Foundation Health Plan of the Northwest and Kaiser Foundation Health Plan, Inc, Western District of Washington, No. 2:17-cv-01611-RSL.*

My education, qualifications and experience are summarized in my curriculum vitae, attached as Exhibit A.

## Scope of Request

I have been asked to estimate the numerosity of persons suffering from anorexia nervosa, bulimia nervosa, binge eating disorder, or other specified feeding or eating disorders[1] and their expected utilization of nutritional counseling who were covered under an ERISA (Employee Retirement Insurance Security Act of 1974) group health plan underwritten and/or administered in New York by defendant Oxford Health Insurance, Inc. ("Oxford") between November 30, 2015 and the present ("Study Period").[2]

## Covered Population and Distribution of Age and Sex

According to Oxford's Supplemental Response to Interrogatory No.17, there were between ██████████████ individuals per year enrolled or otherwise participating in ERISA-governed health benefit plans issued or administered by Oxford in New York for fiscal years 2015 to 2023. See Table 1.

---

[1] Including avoidant/restrictive food intake disorder and eating disorder not otherwise specified.
[2] First Amended Complaint, Molly C., and Naomi L., et.al, Plaintiffs v. Oxford Health Insurance, Inc, Defendant, 1:21-CV-1044-PGG, Paragraph 69, September 16, 2022.

| Table 1: Covered Population, Oxford, New York ||
| Time period | Total Insureds |
| --- | --- |
| DEC 2015 | |
| 2016 | |
| 2017 | |
| 2018 | |
| 2019 | |
| 2020 | |
| 2021 | |
| 2022 | |
| 2023 | |

Source: Oxford Health Insurance, Inc. October 13, 2023. SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17

Given the differences in eating disorder prevalence by age and sex, I estimated the total number of Oxford insureds stratified by sex and the following age groups: 0-9, 10-19, 20-29, 30-39, 40-49, 50-59 and 60-64 years old. The assumed age and sex mix reflects the annual age and sex mix from U.S. Census Bureau estimates for New York State over the 2015-2022 period. For consistency and data availability, the 2023 age and sex mix for New York State is assumed to equal 2022. A summary of the estimated number of male and female Oxford insureds by sex, by year, during the Study Period is presented in Table 2.

**Table 2: Covered Population by Sex**

| Time period | Total Insureds | Estimated Male Subtotal | Estimated Female Subtotal |
|---|---|---|---|
| DEC 2015 | | | |
| 2016 | | | |
| 2017 | | | |
| 2018 | | | |
| 2019 | | | |
| 2020 | | | |
| 2021 | | | |
| 2022 | | | |
| 2023 | | | |

Sources:
+ Total Insured Count: Oxford Health Insurance, Inc. October 13, 2023. SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17
+ Population Mix: U.S. Census Bureau. Annual Estimates of the Resident Population by Single Year of Age and Sex for New York: April 1, 2010 to July 1, 2019 (SC-EST2019-SYASEX-36) and U.S. Census Bureau Annual Estimates of the Resident Population by Single Year of Age and Sex for New York: April 1, 2020 to July 1, 2022 (SC-EST2022-SYASEX-36)

Notes:
1. Model assumes insureds' age range is from 0 to 64 years old.
2. 2023 population age and sex mix not presented in Census file. Model assumes 2023 age and sex mix equivalent to 2022 mix.

## Prevalence of Persons Suffering from Eating Disorders and Utilization of Treatment

One-year prevalence by eating disorder condition, sex, and age are based on estimates presented in the "Economic Costs of Eating Disorders" report[3] by Deloitte Access Economics, the Academy for Eating Disorders (AED) and the Strategic Training Initiative for the Prevention of Eating Disorders (STRIPED).[4] Although my model incorporates Deloitte Access Economics' prevalence rates stratified by condition, sex, and age group, I present a summary of the overall weighted average prevalence by condition and sex in Table 3 below.

---

[3] Deloitte Access Economics. The Social and Economic Cost of Eating Disorders in the United States of America: A Report for the Strategic Training Initiative for the Prevention of Eating Disorders and the Academy for Eating Disorders. June 2020. Available at: https://www.hsph.harvard.edu/striped/report-economic-costs-of-eating-disorders/.
[4] STRIPED is a graduate-level training initiative based at the Harvard T.H. Chan School of Public Health and Boston Children's Hospital.

**Table 3: One-year Prevalence Estimates (%) by Condition and Sex**

|  | Anorexia nervosa | Bulimia nervosa | Binge-eating disorder | Other specified feeding or eating disorder |
|---|---|---|---|---|
| Male | 0.098% | 0.063% | 0.258% | 0.279% |
| Female | 0.180% | 0.381% | 1.034% | 1.312% |

Source: Table 2.3 from Deloitte Access Economics. The Social and Economic Cost of Eating Disorders in the United States of America: A Report for the Strategic Training Initiative for the Prevention of Eating Disorders and the Academy for Eating Disorders. June 2020. Available at: https://www.hsph.harvard.edu/striped/report-economic-costs-of-eating-disorders/.

Notes:
1. Rates presented reflect overall average prevalence rates by condition and sex across the Study Period. Specific annual estimates from 2015 – 2023 have minor differences due to change in the underlying age and sex mix.
2. Original report included the 60-69 age cohort. The 60-69 age cohort prevalence is used for this model's 60-64 age cohort.

Single year prevalence of eating disorders of male and female Oxford insureds during the Study Period is estimated by multiplying the annual total insured population counts by sex and age group by the corresponding prevalence rate. A summary of the one-year prevalence estimates, measured in count of insureds, by condition and sex, is presented in Table 4.

**Table 4: One-year Prevalence Estimates (Count of Insureds) by Condition and Sex**

| Sex | Period | Anorexia nervosa | Bulimia nervosa | Binge-eating disorder | Other specified feeding or eating disorder | Total |
|---|---|---|---|---|---|---|
| Male | DEC 2015 | 314 | 203 | 834 | 900 | 2,252 |
| Male | 2016 | 340 | 220 | 901 | 973 | 2,433 |
| Male | 2017 | 387 | 250 | 1,023 | 1,106 | 2,766 |
| Male | 2018 | 383 | 246 | 1,009 | 1,091 | 2,728 |
| Male | 2019 | 370 | 238 | 974 | 1,054 | 2,636 |
| Male | 2020 | 336 | 216 | 889 | 960 | 2,401 |
| Male | 2021 | 314 | 202 | 833 | 899 | 2,248 |
| Male | 2022 | 294 | 189 | 777 | 839 | 2,099 |
| Male | 2023 | 284 | 182 | 750 | 810 | 2,027 |
|  |  |  |  |  |  |  |
| Female | DEC 2015 | 588 | 1,254 | 3,374 | 4,291 | 9,506 |
| Female | 2016 | 635 | 1,351 | 3,647 | 4,635 | 10,268 |
| Female | 2017 | 723 | 1,532 | 4,148 | 5,268 | 11,671 |

| Female | 2018 | 714 | 1,508 | 4,094 | 5,196 | 11,512 |
| Female | 2019 | 691 | 1,454 | 3,959 | 5,020 | 11,124 |
| Female | 2020 | 620 | 1,304 | 3,552 | 4,507 | 9,981 |
| Female | 2021 | 579 | 1,217 | 3,320 | 4,212 | 9,328 |
| Female | 2022 | 542 | 1,137 | 3,106 | 3,939 | 8,725 |
| Female | 2023 | 524 | 1,098 | 3,000 | 3,803 | 8,425 |
|  |  |  |  |  |  |  |
| Both Sexes | DEC 2015 | 902 | 1,457 | 4,208 | 5,192 | 11,758 |
| Both Sexes | 2016 | 976 | 1,571 | 4,547 | 5,608 | 12,702 |
| Both Sexes | 2017 | 1,110 | 1,782 | 5,171 | 6,374 | 14,438 |
| Both Sexes | 2018 | 1,097 | 1,754 | 5,103 | 6,286 | 14,240 |
| Both Sexes | 2019 | 1,061 | 1,692 | 4,933 | 6,074 | 13,759 |
| Both Sexes | 2020 | 956 | 1,520 | 4,441 | 5,467 | 12,383 |
| Both Sexes | 2021 | 893 | 1,420 | 4,153 | 5,111 | 11,576 |
| Both Sexes | 2022 | 836 | 1,326 | 3,883 | 4,778 | 10,823 |
| Both Sexes | 2023 | 807 | 1,281 | 3,750 | 4,614 | 10,451 |

My model applies one-year treatment rates by condition from a study of eating disorder disease dynamics and treatment coverage by Ward et. al. (see Table 5).[5] Ward et al.'s annual treatment rates are primarily derived from treatment rates from Hudson et. al.'s analysis of the National Comorbidity Study Replication (NCS-R), a nationally representative face-to-face household survey using the WHO Composite International Diagnostic Interview.[6]

My model adjusts down treatment rates for nutritional counseling services from the 'All Service' one-year treatment rates from Ward et. al. by a factor of 60% based on a survey of clinicians who reported that an average of 60% of eating disorder patients are referred to a dietitian.[7] See Table 5.

---

[5] Page 11 of Supplementary Online Content appendix to Ward ZJ, Rodriguez P, Wright DR, Austin SB, Long MW. Estimation of Eating Disorders Prevalence by Age and Associations With Mortality in a Simulated Nationally Representative US Cohort. JAMA Netw Open. 2019;2(10): e1912925. doi:10.1001/jamanetworkopen.2019.12925
[6] Hudson JI, Hiripi E, Pope HG Jr, Kessler RC. The prevalence and correlates of eating disorders in the National Comorbidity Survey Replication. Biol Psychiatry. 2007;61(3):348-358. doi:10.1016/j.biopsych.2006.03.040
[7] McMaster, CM, Wade, T, Franklin, J, Waller, G, and Hart, S. Impact of patient characteristics on clinicians' decisions to involve dietitians in eating disorder treatment. J Hum Nutr Diet. 2022; 35: 512–522. https://doi.org/10.1111/jhn.12980

| Table 5: One-year Treatment Estimates (%) by Condition and Sex | | | |
|---|---|---|---|
| | One-year Treatment Estimate (All Services) | Nutritional Counseling Adjustment | One-year Treatment Estimate (Nutritional Counseling) |
| **Male** | | | |
| Anorexia nervosa | 25% | 60% | 15.00% |
| Bulimia nervosa | 15% | 60% | 9.00% |
| Binge-eating disorder | 21.5% | 60% | 12.90% |
| Other specified feeding or eating disorder | 15% | 60% | 9.00% |
| | | | |
| **Female** | | | |
| Anorexia nervosa | 15% | 60% | 9.00% |
| Bulimia nervosa | 17.1% | 60% | 10.26% |
| Binge-eating disorder | 31.6% | 60% | 18.96% |
| Other specified feeding or eating disorder | 15% | 60% | 9.00% |

Sources:
+ One-year Treatment Rate: Page 11 of Supplementary Online Content appendix to Ward ZJ, Rodriguez P, Wright DR, Austin SB, Long MW. Estimation of Eating Disorders Prevalence by Age and Associations With Mortality in a Simulated Nationally Representative US Cohort. JAMA Netw Open. 2019;2(10): e1912925. doi:10.1001/jamanetworkopen.2019.12925

+ Nutritional Counseling Adjustment: McMaster, CM, Wade, T, Franklin, J, Waller, G, and Hart, S. Impact of patient characteristics on clinicians' decisions to involve dietitians in eating disorder treatment. J Hum Nutr Diet. 2022; 35: 512–522. https://doi.org/10.1111/jhn.12980

The annual count of insureds estimated to utilize nutritional counseling services for an eating disorder is calculated by multiplying the number of insureds by condition and sex by the estimated one-year treatment rates for nutritional counseling services. See Table 6. I estimate between 1,300 to 1,795 Oxford insureds a year would have received nutritional counseling treatment for an eating disorder had this been a covered benefit.

Table 6: One-year Nutritional Counseling Treatment Estimates (Count of Insureds) by Condition and Sex

| Sex | Period | Anorexia nervosa | Bulimia nervosa | Binge-eating disorder | Other specified feeding or eating disorder | Total |
|---|---|---|---|---|---|---|
| Male | DEC 2015 | 47 | 18 | 108 | 81 | 254 |
| Male | 2016 | 51 | 20 | 116 | 88 | 275 |
| Male | 2017 | 58 | 22 | 132 | 100 | 312 |
| Male | 2018 | 57 | 22 | 130 | 98 | 308 |
| Male | 2019 | 56 | 21 | 126 | 95 | 297 |
| Male | 2020 | 50 | 19 | 115 | 86 | 271 |
| Male | 2021 | 47 | 18 | 107 | 81 | 254 |
| Male | 2022 | 44 | 17 | 100 | 76 | 237 |
| Male | 2023 | 43 | 16 | 97 | 73 | 229 |
| | | | | | | |
| Female | DEC 2015 | 53 | 129 | 640 | 386 | 1,207 |
| Female | 2016 | 57 | 139 | 691 | 417 | 1,304 |
| Female | 2017 | 65 | 157 | 786 | 474 | 1,483 |
| Female | 2018 | 64 | 155 | 776 | 468 | 1,463 |
| Female | 2019 | 62 | 149 | 751 | 452 | 1,414 |
| Female | 2020 | 56 | 134 | 673 | 406 | 1,268 |
| Female | 2021 | 52 | 125 | 629 | 379 | 1,185 |
| Female | 2022 | 49 | 117 | 589 | 354 | 1,109 |
| Female | 2023 | 47 | 113 | 569 | 342 | 1,071 |
| | | | | | | |
| Both Sexes | DEC 2015 | 100 | 147 | 747 | 467 | 1,461 |
| Both Sexes | 2016 | 108 | 158 | 808 | 505 | 1,579 |
| Both Sexes | 2017 | 123 | 180 | 918 | 574 | 1,795 |
| Both Sexes | 2018 | 122 | 177 | 906 | 566 | 1,771 |
| Both Sexes | 2019 | 118 | 171 | 876 | 547 | 1,711 |
| Both Sexes | 2020 | 106 | 153 | 788 | 492 | 1,539 |
| Both Sexes | 2021 | 99 | 143 | 737 | 460 | 1,439 |
| Both Sexes | 2022 | 93 | 134 | 689 | 430 | 1,346 |
| Both Sexes | 2023 | 90 | 129 | 666 | 415 | 1,300 |

Findings from Table 6 assume 60% of persons with an eating disorder receiving treatment in a year receive nutritional counseling services. This 60% estimate is from the

clinician survey by McMaster et. al.,[8] which reflects persons with health care insurance. If there are insurance coverage or other barriers to patients receiving nutritional counseling beyond those encountered by patients served by clinicians in the McMaster survey, this may overestimate actual utilization. [9] Therefore, I consider an alternative lower bound set of estimates based on a 24% nutritional counseling adjustment rather than the 60% adjustment described above. [10] Assuming the alternative 24% nutritional counseling adjustment factor, I estimate between 513 to 709 Oxford insureds a year received nutritional counseling treatment for an eating disorder.

### Independent Evaluation of Oxford Claims Data

I have been asked to analyze claims data provided by Oxford, file OXF0032564, described by Oxford as containing "records of claims submitted to Oxford for nutritional counseling services for dates of service November 30, 2015 to September 23, 2023 for members with anorexia nervosa, bulimia nervosa, EDNOS, BED, or ARFID."[11]

### Total Claims

The file OXF0032564 includes records for 17,323 billable events, representing 8,464 unique claims by 1,222 unique members. There were approximately 700 unique claims submitted each year before January 1, 2021 and approximately 1,650 unique claims submitted each year after January 1, 2021. See Table 7.

---

[8] McMaster et. al. Page 7.

[9] Economists use the term "insurance effect" when there are insurance barriers limiting or excluding coverage for certain conditions/treatments. It arises when people either do not have insurance or they do not have insurance coverage for certain conditions and/or treatments. When this occurs, such persons will demand less services/treatments than they would have if they had effective insurance, i.e., insurance coverage that included such service and/or treatment. Insurance changes the demand for care; there exists a strong and positive relationship between healthcare utilization and insurance coverage. This relationship has been documented extensively in the economics literature and is widely accepted.

[10] The 24% figure is determined by calculating the rate of nutritional counseling (lifetime) treatment as a proportion of all treatment types (lifetime) found in Yager, J., Landsverk, J., & Edelstein, C. K. (1989). Help seeking and satisfaction with care in 641 women with eating disorders. I. Patterns of utilization, attributed change, and perceived efficacy of treatment. The Journal of nervous and mental disease, 177(10), 632-637.

[11] Oxford Health Insurance. DEFENDANT'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES. October 13, 2023. P. 3.

| Table 7: Count of Unique Members and Claims by Year | | |
|---|---|---|
| | **Total Unique Member IDs** | **Total Unique Claims IDs** |
| Nov 30 - Dec 31 2015 | 22 | 34 |
| 2016 | 157 | 577 |
| 2017 | 150 | 620 |
| 2018 | 170 | 727 |
| 2019 | 179 | 682 |
| 2020 | 199 | 889 |
| 2021 | 283 | 1,249 |
| 2022 | 314 | 2,103 |
| Jan 01 - Sep 22 2023 | 250 | 1,638 |

Sources: OXF0032564

Note: total unique claims IDs do not sum to 8,464, as some claims IDs include dates of service over multiple years.

<u>Denied Claims</u>

To estimate denied claims, if the OXF0032564 claims file is filtered to only line-items with an "Adjustment Description" as "NOT A COVERED BENEFIT" or "SERVICES ARE DENIED BECAUSE THEY ARE NOT A COVERED BENEFIT (REMARK CODE CES005)," there are 1,461 unique claims by 458 unique members with dates of service over the entire Study Period (November 30, 2015 to present).[12] However, there are several other adjustment description codes that could be indicative of a denied claim. Therefore, I consider the 1,461 unique claims by 458 unique members a minimum estimate.

Using the two adjustment descriptions described above as the minimum definition of a denied claim, the number of unique members by full calendar year (January to December) for 2016 to 2022 with a denied claim ranges from 10 (2022) to 137 (2020). The number of unique claims with a denial ranges from 24 claims (2022) to 346 claims (2020). See Table 8.

---

[12] 1,363 unique claims by 430 unique members if limiting to dates of service from November 30, 2015 to December 31, 2020.

**Table 8: Count of Unique Members and Claims with Denied Claim by Year**

| | Total Unique Member IDs | Total Unique Claims IDs | |
|---|---|---|---|
| Nov 30 – Dec 31 2015 | 9 | 10 | |
| 2016 | 81 | 183 | |
| 2017 | 84 | 235 | |
| 2018 | 104 | 318 | |
| 2019 | 115 | 284 | |
| 2020 | 137 | 346 | |
| 2021 | 22 | 74 | |
| 2022 | 10 | 24 | |
| Jan 01 – Sep 22 2023 | 0 | 0 | |

Sources: OXF0032564

Notes: Adjustment_Description reported as "NOT A COVERED BENEFIT" or "SERVICES ARE DENIED BECAUSE THEY ARE NOT A COVERED BENEFIT (REMARK CODE CES005)."

<u>Comparison of Insureds Receiving Nutritional Counseling Treatment</u>

Table 9 compares the annual number of unique insureds requesting nutritional counseling treatment for eating disorders in Oxford's claims records with estimates from my prevalence and treatment model described above.

**Table 9: Comparison of Count of Unique Members Estimated by Year**

|  | Oxford Records (OXF0032564) | Baseline Estimate | Low Estimate |
|---|---|---|---|
| Nov 30 - Dec 31 2015 | 22 | 1,461 | 577 |
| 2016 | 157 | 1,579 | 624 |
| 2017 | 150 | 1,795 | 709 |
| 2018 | 170 | 1,771 | 699 |
| 2019 | 179 | 1,711 | 676 |
| 2020 | 199 | 1,539 | 608 |
| 2021 | 283 | 1,439 | 568 |
| 2022 | 314 | 1,346 | 531 |
| Jan 01 - Sep 22 2023 | 250 | 1,300 | 513 |

Note: 2015 and 2023 are not full calendar years, so comparisons with Fox Model estimates of annual unique members may be limited. One method of adjustment not shown above is to adjust by number of months. For example, 2015 is effectively one month. Therefore, the 577-count presented in the Fox Model (Low Estimate) column could be adjusted to reflect one-twelfth of the original estimate (i.e. 577 * (1/12) = 48).

From Table 9, there are significant differences between Oxford figures and the estimating models above. These differences could result from many factors, but I hypothesize a key element of this difference is the knowledge by Oxford insureds that over most of the Study Period, nutritional counseling for eating disorders was not a covered service. Thus, many insureds would be less likely to submit a claim for a service they expect would be denied.

<u>Average Allowed Amounts</u>

With respect to Oxford's historical reimbursement of nutritional counseling claims, the average allowed amount per unique claim after January 1, 2021, excluding denied claims and claims with ██████████████  However, these estimates assume that denied claims are only represented by the two adjustment descriptions described above. If the list of adjustment descriptions is expanded, this will affect the average reimbursement calculations.

## **Compensation**

I am being compensated at the rate of $300 per hour for this engagement.

## References

1. Deloitte Access Economics. The Social and Economic Cost of Eating Disorders in the United States of America: A Report for the Strategic Training Initiative for the Prevention of Eating Disorders and the Academy for Eating Disorders. June 2020. Available at: https://www.hsph.harvard.edu/striped/report-economic-costs-of-eating-disorders/.

2. Hudson JI, Hiripi E, Pope HG Jr, Kessler RC. The prevalence and correlates of eating disorders in the National Comorbidity Survey Replication. Biol Psychiatry. 2007;61(3):348-358. doi: 10.1016/j.biopsych.2006.03.040

3. McMaster, CM, Wade, T, Franklin, J, Waller, G, and Hart, S. Impact of patient characteristics on clinicians' decisions to involve dietitians in eating disorder treatment. J Hum Nutr Diet. 2022; 35: 512–522. https://doi.org/10.1111/jhn.12980

4. Molly C., and Naomi L., et.al, Plaintiffs v. Oxford Health Insurance, Inc, Defendant, 1:21-CV-1044-PGG, First Amended Complaint, September 16, 2022.

5. OXF0032564 (Excel File)

6. Oxford Health Insurance, Inc. October 13, 2023. SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17

7. Supplementary Online Content appendix to Ward ZJ, Rodriguez P, Wright DR, Austin SB, Long MW. Estimation of Eating Disorders Prevalence by Age and Associations With Mortality in a Simulated Nationally Representative US Cohort. JAMA Netw Open. 2019;2(10): e1912925. doi:10.1001/jamanetworkopen.2019.12925

8. U.S. Census Bureau. Annual Estimates of the Resident Population by Single Year of Age and Sex for New York: April 1, 2010 to July 1, 2019 (SC-EST2019-SYASEX-36)

9. U.S. Census Bureau Annual Estimates of the Resident Population by Single Year of Age and Sex for New York: April 1, 2020 to July 1, 2022 (SC-EST2022-SYASEX-36)

10. Yager, J., Landsverk, J., & Edelstein, C. K. (1989). Help seeking and satisfaction with care in 641 women with eating disorders. I. Patterns of utilization, attributed change, and perceived efficacy of treatment. The Journal of nervous and mental disease, 177(10), 632-637.

I declare under penalty of perjury under the laws of the State of New York and the United States that the foregoing is true and correct. Executed this 21st day of December, 2023 at Shoreline, Washington.

By: _____

Frank G. Fox, Ph.D.
Declarant

# Exhibit A

## FRANK G. FOX, JR.

**Contact Information:**          **frankgfox@comcast.net**

**Telephone:**                        206.914.8866

**Website:**                           **https://healthtrends.consulting/**

## Education

| | |
|---|---|
| **1977** | Ph.D., University of Washington, Seattle, WA (Economics) |
| **1972** | M.A., University of Washington, Seattle, WA (Economics) |
| **1970** | B.A., University of Washington, Seattle, WA (Economics) |

## Professional Experience

**May 1996 - Present**   **HealthTrends, Shoreline, WA**
                                    **Principal**

Direct work with health care organizations in the development and implementation of actions for numerous projects. This work is principally quantitative analysis and simulation modeling, Projects include demand and financial modeling, including current and future business actions, such as ambulatory surgery centers, hospital departments, etc.; future year budget forecasts and business plan development; statistical survey research and analysis; strategic plan development; asset and program/service valuation, including physician practices and other businesses; new business development; joint ventures; compilation and analysis of information defining/explaining market growth forecasts; medical staff development plans; and technology acquisition/implementation. There have been numerous engagements including preparation of Declarations and Expert Reports. I have also had numerous depositions taken as part of litigation engagements. These projects have included:

- Development of demand and financial models for organization business planning and future year budgets. Includes developing databases and preparing models that simultaneously link "dependent" and "independent" variables that combined simulate utilization and financial projections. Includes preparing sensitivity analyses to test the effect of changes in key model variables on projected outcomes.

- Development of financial statements, including income and expense, cash flow, asset depreciation and balance sheets. These schedules are used to define prior performance and model future growth. Includes engagements assisting small business "start-up" operations, including serving as chief financial officer, but in a consultant role.

- Expert consultation regarding statistical/mathematical issues associated with clients' surveys and other sampling work

- Primary and secondary survey research.  Includes formulating best research design, developing survey questionnaires, utilizing in-person or other survey approach(es), preparing statistical analysis of survey responses and report preparation

- Preparation of volume and financial performance models for free-standing emergency departments, urgent care centers, medical clinics, imaging centers and ambulatory surgery centers, Includes preparation of demand and revenue forecasts by type of service, program or physician sub-specialty, Also includes estimation of direct and indirect expenses of business operations, including FTE ("full-time equivalent") employment forecasts and capital expenditure modeling. Designed to identify key performance statistics and provide risk analysis of alternative utilization, reimbursement, and expense scenarios

- Preparation of demand and financial models to define, evaluate and model demand and financial performance for new programs and technologies, e.g., transplantation programs including liver and pancreas transplantation; Gamma Knife program; PET scanner; and transcranial magnetic stimulation (" TMS").

- Preparation of demand and financial models to evaluate current performance and prepare service/program forecasts. Representative projects include imaging centers, including forecasts for all key modalities; emergency services; cardiac services; obstetrics and women's' services; sleep lab; oncology programs, including medical oncology and radiation therapy; and ambulatory surgery centers.

- Preparation of medical staff development plans, including integration of quantitative estimates of demand by specialty, current and projected supply, financial modeling, and qualitative interview research. Designed to assist organizations' alignment/integration with physicians.

- Preparation of valuation studies, which require assessment of "fair market value." This includes contractual arrangements, where buyers must meet fair market value standard for federal statutes, It has also included preparation of fair market value estimates of physician practices.

- Preparation of strategic plans, including market demographic and economic profiles, organization performance data across key services/programs, including portfolio analysis, competitor analysis, and identification and prioritization of goals, strategies and implementation actions.

- Preparation of marketplace statistics on population, utilization and market share figures to assist organizations' strategic planning and marketing programs.

- Expert testimony. I have been qualified and have testified as a statistical expert, an expert in economics and health economics, and a healthcare planning expert in a large number of courts-of-law, This includes deposition and expert testimony in the following: (1) Federal District Court, Western District of Washington (2022,2020); (2) Federal District Court, Eastern District of Washington (2019); (3) Federal District Court, Oregon (2006); (4) King County Superior Court, Washington (2004); and (5) before Washington and Alaska Administrative Law Hearings, The Washington Administrative Law Hearings included twenty-one separate Washington Department of Health Administrative Law Judge ("DOH ALJ") Hearings—one in 2004, 2008, 2010, two cases in 2011, two cases in 2012, two cases in 2013, four cases in 2014, one case in 2015, two cases in 2016, two cases in 2018, two cases in 2020 and one case in 2021, There were two hearings before the Alaska Office of Administrative Hearings, one in 2016 and another in 2017.

- Depositions, Expert Declarations, Expert Reports, Rebuttal Reports and Depositions. I have provided expert declarations and/or expert reports and rebuttals in the following cases since 2019: (1) In May 2019, I provided a Declaration regarding models I prepared estimating utilization and cost for selected treatments for patients with diagnoses identified in the California Mental Health Parity Act and substance abuse in *Ames v. Anthem Blue Cross Life & Health Insurance Company*, Los Angeles Superior Court Case No. BC591623, (2) In May 2019, I provided Declaration regarding estimates of the number of Plan insureds with a prevalence of Autism Spectrum Disorder ("ASD") who utilized and expended monies for applied behavior therapy ("ABA") in *JR v. CHI et.al.,* United States District Court, Western District of Washington, Seattle, No. 2:18:cv-01191-JLR, (3) In June 2019, I prepared an Expert Report in *DT v. NECA/IBEW Family Medical Plan, Civil Action No. 2:17-cv-00004 (RAJ)*, which estimated utilization and expenditures for ABA and/or physical therapy ("PT"), occupational therapy ("OT") or speech therapy, for Plan insureds with a prevalence of ASD, (4) In July 2019, I prepared a series of Rebuttal Reports in *DT v. NECA/IBEW Family Medical Plan, Civil Action No. 2:17-cv-00004 (RAJ)*, (5)  In January 2020, I provided a Declaration valuing coverage for residential treatment for insureds with eating disorders in a class action case in *Rea v. Blue Shield of California*, *Los Angeles Superior Court Case No. B468900*, (6) In July 2020, I prepared an Expert Report in *Crosby v. Blue Shield of California, Magellan Health, et. al., Case No.:  8:17-CV-01970-CJC-JDE;* (8) In August 2020, I prepared a Rebuttal Report also for

*Crosby v. Blue Shield of California, Magellan Health, et. al., Case No.: 8:17-CV-01970-CJC-JDE*; (9) In October 2020, I prepared a Declaration in support of a motion for summary adjudication of Health Net's fifth cause of action for intentional interference with contractual relations in *Dual Diagnosis Treatment Center Inc., v. Health Net, Los Angeles Superior Court, Case No. LC104357*; (10) November 2020, I provided a supplemental Declaration *in Rea v. Blue Shield of California, Los Angeles Superior Court Case No. B468900*; (11) In January 2022, I was deposed in in *Dual Diagnosis Treatment Center Inc., v. Health Net, Los Angeles Superior Court, Case No. LC104357*; (12) In June 2022, I was deposed in *Decision by the Department of Health Regarding Two Certificate of Need Applications Proposing to Establish Medicare and Medicaid Certified Hospice Services in Thurston County, No. M2021-923; (13)*In August 2022, I provided a Declaration *in C.P. v. Blue Cross Blue Shield of Illinois, Federal District Court, Western District of Washington, No.3:20-cv-06145-RBJ; (14)* In August 2022, I provided an Expert report *in C.P. v. Blue Cross Blue Shield of Illinois, Federal District Court, Western District of Washington, No.3:20-cv-06145-RBJ; (15)* In September 2022, I was deposed in *C.P. v. Blue Cross Blue Shield of Illinois, Federal District Court, Western District of Washington, No.3:20-cv-06145-RBJ; (16)* In January 2023, I prepared a Declaration in *Schmitt v. Kaiser Foundation Health Plan of Washington, Kaiser Foundation of Washington Options Inc., Kaiser Foundation Health Plan of the Northwest and Kaiser Foundation Health Plan, Inc, Western District of Washington, NO. 2:17-cv-01611-RSL;* and (17) In May 2023, I prepared an Expert Report in *Schmitt v. Kaiser Foundation Health Plan of Washington, Kaiser Foundation of Washington Options Inc., Kaiser Foundation Health Plan of the Northwest and Kaiser Foundation Health Plan, Inc, Western District of Washington, NO. 2:17-cv-01611-RSL*

- Preparation of Certificate of Need applications.  Projects have included: (1) the development and operation of freestanding ambulatory surgery centers;(2)  the purchase and sale of two hospitals in Eastern Washington in Spring 2003; (3) the development and operation of St. Anthony Hospital in Gig Harbor Washington in Fall 2003; (4) the development of a liver transplant program for Swedish Health Services in Seattle WA in Summer 2003; (5) the preparation of 3 kidney dialysis center applications in Spokane County, WA in fall 2003; (6) the preparation of a kidney dialysis center application in Clark County, WA in spring 2005; (7) the development and operation of a new hospital—Swedish Issaquah Hospital--in Issaquah Washington, submitted in 2004;  (8) the  development and operation of a freestanding hospital in Eugene Oregon, submitted in December 2005; (9) the expansion of acute care beds for St. Francis Hospital, Federal Way, WA submitted in late Fall 2006; (10) the build-out of a hospital tower and the expansion of licensed capacity by 166 acute care beds for Providence Regional Medical Center in Everett WA this  represented the largest expansion project in Washington CN history), also submitted in late Fall 2006; (11) the preparation of a certificate of need application for a 152-bed expansion and 21-bed NICU expansion for Sacred Heart Medical Center in Spokane WA, completed in February 2009; (12 & 13) the preparation of two certificate of need applications for percutaneous coronary intervention (PCI) programs at

Stevens Hospital, Edmonds WA and Valley Medical Center, Renton WA—both applications were submitted in February 2009; (14) the preparation of a certificate-of-need application for a 27-bed NICU expansion Kadlec Medical Center, Richland WA, submitted in August 2009; (15) preparation of a certificate of need application for a 114-bed expansion project for Kadlec Medical Center, Richland WA, submitted November 2009; (16) preparation of a certificate of need application for a new 58-bed hospital in the Southeast Planning Area, submitted in December 2009; (17) preparation of a certificate of need request for Swedish Health Services' Lease of Stevens Hospital in Edmonds WA, submitted in May 2010;  (18) preparation of a certificate of need for a 25-bed expansion of Mary Bridge Children's Hospital, submitted in July 2010; (19) preparation of a certificate of need request for pancreatic transplantation at Sacred Heart Medical Center; (20) preparation of a certificate-of-need request for a 20-bed expansion of Tacoma General Hospital's Neonatal Intensive Care Unit ("NICU"); (21)  preparation of a certificate-of-need request for a 4-bed expansion of Tacoma General Hospital's Intermediate Care Nursery ("ICN"); (22) preparation of a certificate-of-need request for a 16-bed Intermediate Care Nursery ("ICN") at Swedish/Issaquah, submitted in January 2011; (23) preparation of a certificate-of-need request to operate an elective percutaneous coronary intervention ("PCI) program at Swedish/Issaquah; (24) preparation of a certificate-of-need request for an 11-bed expansion of Good Samaritan Hospital, submitted in June 2011; (25) preparation of a certificate of need for a 20-bed expansion of Mary Bridge Children's Hospital, submitted in October, 2011; (26) preparation of a certificate-of-need request for an ambulatory surgery center in Gig Harbor, Washington, submitted October 2011 (27) preparation of a certificate-of-need request for a new 30-bed psychiatric hospital in Everett, Washington, submitted November 2011; (28) preparation of a certificate-of-need request to operate an elective percutaneous coronary intervention ("PCI) program at Swedish/First Hill, submitted in February 2012; (29) preparation of a certificate-of-need request for an additional Level I rehabilitation beds at Providence St. Peter Hospital, submitted in March 2012; (30) preparation of a certificate-of-need request to lease Wenatchee Valley Hospital, submitted in September 2012; (31) preparation of a certificate-of-need request to lease United General Hospital, submitted November 2012; (32) preparation of a certificate of need to operate an ambulatory surgery facility, submitted in July, 2013; (33) preparation of a certificate of need application to operate three additional Level I rehabilitation bed at PeaceHealth St. Joseph Medical Center, Bellingham Washington, September 2013; (34) preparation of a certificate of need application to operate a kidney dialysis facility,  submitted in January 2014; (35) preparation of a certificate of need to operate an ambulatory surgery facility, submitted in February 2014; (36) preparation of a certificate-of-need request for a new 34-bed psychiatric hospital in Monroe, Washington, submitted November 2013; (37) preparation of a certificate of need to operate a kidney dialysis facility, submitted in May 2014; (38) preparation of a certificate of need for Level I rehabilitation beds for Wenatchee Valley Hospital, submitted November 2014; (39 and 40) preparation of two separate  certificate of need applications to operate kidney dialysis

facilities in different planning areas, submitted in November 2014; (41) preparation of a certificate of need application for a 120 bed psychiatric hospital, Tacoma Washington, submitted December 2014; (42) preparation of a certificate of need application to operate a kidney dialysis facility in Pierce County, submitted in February 2015; (43) preparation of a certificate of need application for an ambulatory surgery center for Swedish Health Services and Proliance, submitted in March 2015; (44) preparation of a certificate of need application for a 100-bed psychiatric hospital, Spokane County, submitted in June 2015; (45) preparation of a certificate of need to operate an ambulatory surgery center in Bellevue in East King Planning Area (2015); (46) preparation of a certificate of need to operate an ambulatory surgery center in Issaquah in East King Planning Area (2015); (47) preparation of a certificate of need to operate an ambulatory surgery center in Seattle in the North King Planning Area (2015); (48) preparation and submittal of a certificate of need application for MultiCare Good Samaritan Hospital for additional Level I rehabilitation beds (2015); (49) preparation and submittal of a certificate of need application for MultiCare Good Samaritan Hospital for additional acute care beds (2015); (50) preparation and submittal of a 100-bed psychiatric hospital certificate of need (Oregon) (2016); (51) preparation and submittal of a certificate of need to operate a kidney dialysis facility in Pierce County (2016); (52) preparation and submittal of a certificate of need to operate an 85-bed psychiatric hospital in Thurston County (2016); (53) preparation of a certificate of need to operate an ambulatory surgery center in Everett in the Central Snohomish Planning Area (2016); (54) preparation of a certificate of need to operate an ambulatory surgery center in the Grant County Planning Area (2016); (55) preparation of a certificate of need to operate an ambulatory surgery center in Okanogan County Planning Area (2016); (56) preparation of a certificate of need for approval of the purchase of Deaconess Hospital in the Spokane Planning Area (2017); (57) preparation of a certificate of need for approval of the purchase of Valley Hospital in the Spokane Planning Area (2017); (58) preparation of a certificate of need to operate an ambulatory surgery center in the Spokane County Planning Area (2017); (59) preparation of a certificate of need to operate an ambulatory surgery center in Central King County Planning Area (2017); (60) preparation and submittal of a certificate of need to expand a kidney dialysis facility in Grays Harbor County (2017); (61) preparation and submittal of a certificate of need to relocate and expand a kidney dialysis facility in Grant County (2017); (62) preparation and submittal of a certificate of need to operate an ambulatory surgery center in the East King Planning Area (2017); (63) preparation and submittal of a certificate of need to expand MultiCare Tacoma General Hospital's Level IV Neonatal Intensive Care Unit (NICU) (2018); (64, 65, 66, 67,68, 69) preparation and submittal of six separate certificates of need to expand kidney dialysis facilities in Pierce County (2018); (70 & 71) preparation and submittal of certificates of need to expand kidney dialysis facilities in Thurston County (2018); (72) preparation and submittal of a certificate of need to establish a kidney dialysis facility in Clark County (2018); (73) preparation and submittal of a certificate of need to expand a kidney dialysis facility in Grant County (2018); (74) preparation and submittal of a certificate of need to develop a kidney

dialysis facility in King County (2018); (75) preparation and submittal of a certificate of need to develop a kidney dialysis facility in Cowlitz County (2018); (76) preparation and submittal of a certificate of need to expand a kidney dialysis facility in Adams County (2018); (77) preparation and submittal of a certificate of need to expand a kidney dialysis facility in Okanogan Count (2018); (78) preparation and submittal of a certificate of need to expand a kidney dialysis facility in Mason County (2018); (79) preparation and submittal of a certificate of need to expand a kidney dialysis facility Thurston County (2019); (80) preparation and submittal of a certificate of need to develop a kidney dialysis facility in King County (2019); (81) preparation and submittal of a certificate of need to expand a kidney dialysis facility (Benton County (2019); (82) preparation and submittal of a certificate of need to operate an ambulatory surgery center in the East King Planning Area (2019); (83) preparation and submittal of a 100-bed psychiatric hospital certificate of need (Oregon) (2019); (84) preparation and submittal of a certificate of need to expand an ambulatory surgery facility in East Pierce Planning Area (2019); (85) ) preparation and submittal of a certificate of need to expand an ambulatory surgery facility in the East Pierce Planning Area (2019); (86) preparation and submittal of a certificate of need to expand an ambulatory surgery facility in East King Planning Area (2019); (87) preparation and submittal of a certificate of need to expand an ambulatory surgery facility in the Central Pierce Planning Area (2020); (88) preparation and submittal of a certificate of need to develop an elective PCI program in the Spokane County Planning Area (2020); (89) preparation and submittal of a certificate of need to relocate and expand a kidney dialysis facility Thurston County (2020); (90) preparation and submittal of a certificate of need to develop and operate a kidney dialysis facility in Yakima County (2020); (90) preparation and submittal of a certificate of need to relocate a dialysis facility in Mason County (2020); (92) preparation and submittal to expand a dialysis facility in Cowlitz County (2020); (93) Preparation and submittal to expand a dialysis facility in Stevens County; (94) preparation and submittal of a certificate of need to establish an ambulatory surgery facility in the East Pierce Planning Area (2020); (95) preparation and submittal of a certificate of need to operate a hospice agency in Spokane County (2020); (96) preparation and submittal of a certificate of need to operate a hospice agency in Thurston County Washington (2021); (97) preparation of a certificate of need application to relocate MultiCare Mary Bridge Children's Hospital in Tacoma Washington (2021); (98) preparations and submittal of a certificate of need application for the purchase of Capital Medical Center, Olympia (2021); (99) preparation and submittal of a certificate of need to establish an ambulatory surgery facility in the Spokane Planning Area (2021); (100) preparation and submittal to expand a dialysis facility in Grays Harbor County WA (2021); (101) preparation and submittal of a certificate of need to develop and operate a kidney dialysis facility in Yakima County (2021); (102) preparation and submittal to expand a dialysis facility in Cowlitz County (2021); (103) preparation and submittal of a certificate of need to purchase MPT ownership in Capital Medical Center building (2021); (104) preparation and submittal of a certificate of need to operate a hospice agency in Spokane

County (105) preparation and submittal of a certificate of need to add licensed NICU bassinets to Mary Bridge Children's Hospital (2022); (106) preparation and submittal to add OR capacity to an ambulatory surgical facility in East Pierce County (2022); (107) preparation and submittal for certificate of need approval to operate a two OR ambulatory surgery facility in Thurston County; (108) preparation and submittal of a certificate of need request to add 160 licensed acute care beds to Good Samaritan Hospital in Puyallup WA; (109) preparation and submittal to establish a 40-bed Level I rehabilitation hospital in Snohomish County (2022); (110) preparation and submittal to establish an ambulatory surgical facility in Spokane County (2022); (111) preparation and submittal to establish an ambulatory surgical facility in Whatcom County (2022); and (112) preparation and submittal of a Public Interest Application a rehabilitation hospital in within the 7-county Economic Development Region 11 ("EDR 11") in Minnesota.

- These projects included preparation of detailed utilization and financial performance models, including income and expense, cash flow statements, asset depreciation schedules and balance sheets. They also included preparation and submittal of complete applications generally to the Washington Department of Health.

**July 2001-July 2002   Clear Medical, Bellevue WA**
**Vice President, Finance and Chief Financial Officer**

Financial stewardship for Clear Medical, Inc.  This included developing and properly using financial reports and performance information, in aggregate, and at the product/service level, to monitor and improve company performance. Performance was measured by contribution margin, cash flow and return on investment.  As the company's financial leader, responsible for daily fiscal activities and longer-term financial viability and growth.  Responsibilities included:

- Preparation of weekly and monthly financial reports for the chief executive officer, the Board of Directors, and other members of the executive team.  Financial reports include income and expense statements, cash flow and balance sheet statements. These reports were compiled for year-to-date and annualized estimates.

- Preparation of monthly departmental budgets, then monitoring actual expenditures against budget estimates.  Also responsible for budget forecasts, used to guide departmental growth.

- Preparation of 5-year forecast models to estimate financial performance and resource requirements.

- Correct daily operation of accounts payable and accounts receivable activities, as well as company payroll and other routine financial operations

- Monitoring company performance against financial performance forecasts and "key performance indicators" (KPIs) included in the Strategic Plan.   This included implementing corrective actions to better assure actual performance matches forecasts and benchmarks.

- Monitoring overall company performance against its Strategic Plan, as defined by performance benchmarks.  Responsible for providing annual revisions/updates to the Clear Medical Strategic Plan.


**1993 - April 1996     <u>Franciscan Health System (FHS), Aston, PA</u>**
**Vice President, Research and Development**

Responsible for FHS research and development.  This included all research to support focused technology and other studies.  Selected studies included:
- Stereotactic breast biopsy technology
- Minimally invasive surgery technology
- Advanced healthcare practitioners
- Alternative medicine (healing/wholistic medicine)
- Genetic engineering
- Patient-focused care

Responsible for leadership and staff support to the FHS Technology Steering Committee, a multidisciplinary group, including numerous physicians, who had responsibility for identifying and making technology implementation recommendations across FHS.
Responsible for strategic planning, including the compilation of information, the development of market goals and strategies, and the preparation of focused strategic plans.  This also included seminars and workshops to prepare and present plans.
Responsible for compilation, analysis and presentation of quantitative and qualitative information on FHS products, services and markets, including:

- Utilization forecast models, by service line, for each FHS hospital, to model the effect of managed care.
- The development of emergency department care delivery models.
- The development of an ambulatory surgery model.
- Preparation of market share and service line projections.

Responsible for service and program integration/consolidation across 3 FHS-West hospitals,

including outsourcing all transcription, saving $750,000 annually, and consolidating laboratory services, saving $3 million over five years.

Responsible for the development and implementation of a Community Health Model for FHS organizations.

**1988 - 1993    Franciscan Health Services - Washington, Tacoma, WA**
**Vice President, Research and Development**

Responsible for new product and service identification and development, including the development of a research process, the Technology Model, which was later implemented throughout Franciscan Health System.

Studies included:

- Magnetic resonance imaging
- Laser technologies
- Imaging, including ultrasound, SPECT cameras and CT
- Continuous quality improvement models
- Optical disk technologies
- Flow cytometry equipment

Responsible for the feasibility study, design and implementation of an MRI service at 4 FHS-West hospitals, including:

- Business and operations plan development
- Acquisition of three MRI systems and service contracts, which represented over $8 million in capital and operating expenses
- Recruitment of staff, and day-to-day operational responsibility for the MRI department with an annual budget of $4 million, for two years

**1985 - 1988    Franciscan Health Services - Washington, Tacoma, WA**
**Director, Planning and Research**

- Responsible for utilization and financial projections for numerous    program/services, as key elements of business plan preparation.
- Responsible for all regulatory interface, including all certificate-of-need applications, and work with local and state planning agencies.
- Responsible for all utilization and service area forecasts and competitor analysis for annual hospital strategic plans and budgets.

- Responsible for all primary and secondary market research, including both internal survey projects, e.g., patient satisfaction surveys, and external research, e.g., large, community-wide, surveys.

**1984-1985     Washington State Hospital Commission, Olympia, WA**
**Associate Director, Program Planning and Research**

Responsible for technical and staff management of Program Planning and Research Division for the Hospital Commission, including:

- Design, development and management of the Commission Hospital Abstract Reporting System (CHARS), which is still used to compile and analyze patient discharge data from every hospital in the state.
- Design and development of target revenue estimates for statewide hospital revenues, required by the Washington Legislature.  This task required compilation and analysis of very large data sets containing cost and revenue data for each Washington hospital.
- Development and implementation of charity care definitions and policies across all Washington hospitals.
- Management of Hospital Commission Certificate-of-Need reviews.

**1983         SysteMetrics, Inc., Santa Barbara, CA**

**Senior Health Care Economist**
Responsible for acquisition/development of health care data and   forecasting models.

**1977-1983     HDR Systems, Santa Barbara, CA**

**Senior Economist/Project Manager**
Project management of numerous military studies. Responsibilities included proposal preparation, study definition, milestone and budget scheduling. This included: Publication scheduling and deadlines; assignment and coordination of interdisciplinary staff input; and technical review and edit.
Developed and implemented econometric forecasting models.  These models forecast key economic and demographic parameters, e.g., employment/unemployment, wage levels, and population, for a defined geographic region.
Responsible for development and analysis of other economic technical studies, including development and use of regional inter-industry (input-output) models.

**1971-1977    University of Washington, Seattle, WA**

**Instructor**
Taught courses in micro and macroeconomics.


**Computer Language Experience**
Statistical Analysis System (SAS)
Statistical Package for the Social Sciences (SPSS)
STATA
Access


**Honors and Awards**
Phi Beta Kappa
Omicron Delta Epsilon (Economics Honor Society)
Magna Cum Laude Graduate


**Memberships**
American College of Health Executives
Washington State Hospital Association

**Published Articles and Presentations**

**Publications**

"Developing A Model for Technology Assessment," Frank Fox, Ph.D.   and Ellen Barron, Health Progress, pages 50-58, January-February 1993.
"Linking Technology with Strategic and Financial Plans:  A Case Study of Franciscan Health System," Frank Fox, Ph.D. and Ellen Barron, American Hospital Association, Hospital Technology Special Report, Volume 14, Number 11, September 1995.

**Presentations**
"Assessing Marketplace Impact of Future Clinical Technologies," Technology and Healthcare Marketing--Future Vision Conference, The Alliance for Healthcare Strategy and Marketing, November 10-12, 1996.
"Smart Technology," Real Solutions for Healthcare Materials Management—Annual Conference, American Society for Healthcare Materials Management, August 11-13, 1996.
"Smart Technology," 16th Annual Meeting—Strategy Forum, Society for Healthcare Planning and Marketing, American Hospital Association, April 24-27, 1994.

**PROOF OF SERVICE**

I, Felicia Phillips, declare as follows:

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 19839 Nordhoff Street, Northridge, CA 91324.

On December 21, 2023, I served the foregoing document described as: PLAINTIFFS' DISCLOSURE OF EXPERT WITNESSES PURSUANT TO PARAGRAPH 7.b. OF THE MARCH 3, 2023 CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER [DOCKET NO. 50] on the interested parties in this action by serving a copy thereof in a sealed envelope addressed as follows:

| | |
|---|---|
| Sarah Michelle Gilbert | Attorneys for Defendants |
| CROWELL & MORING LLP | Oxford Health Insurance, Inc. |
| 590 Madison Avenue, 20th Floor | |
| New York, NY 10022 | |
| sgilbert@crowell.com | |
| | |
| Christopher Flynn (admitted *pro hac vice*) | Attorneys for Defendants |
| Lauren Nunez (admitted *pro hac vice*) | Oxford Health Insurance, Inc. |
| CROWELL & MORING LLP | |
| 1001 Pennsylvania Avenue NW | |
| Washington, DC 20004-2595 | |
| cflynn@crowell.com | |
| lnunez@crowell.com | |

[X]    (BY E-MAIL) I caused the above document to be sent via e-mail to the following email addresses: sgilbert@crowell.com, cflynn@crowell.com, lnunez@crowell.com

[ ]    (STATE) I declare under penalty of perjury under the Laws of the State of California that the foregoing is true and correct.

[X]    (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on December 21, 2023, at Walpole, New Hampshire.


_____*/s/ Felicia Phillips*_____
Felicia Phillips

# EXHIBIT B

Eugene Killian, Jr.
The Killian Firm, P.C.
555 Route 1 South, Suite 430
Iselin, New Jersey 08830
(732) 912-2100

Lisa S. Kantor, admitted *pro hac vice*
Kantor & Kantor LLP
19839 Nordoff Street
Northridge, CA 91324
(818) 886-2525

Attorneys for Plaintiffs
Molly C. and Naomi L., on behalf of themselves
and all others similarly situated

Kathryn M. Trepinski, admitted *pro hac* vice
Law Offices of Kathryn Trepinski
8840 Wilshire Boulevard, Suite 333
Beverly Hills, CA 90211
(310) 201-0022

Elizabeth K. Green, admitted *pro hac vice*
Green Health Law, APC
201 N. Brand Blvd., Suite 200
Glendale, CA 91203
(818) 722-1164

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

MOLLY C. AND NAOMI L., ON BEHALF OF
THEMSELVES AND ALL OTHERS
SIMILARLY SITUATED,

                              Plaintiffs,

            -against-

OXFORD HEALTH INSURANCE, INC.,

                              Defendant.

--------------------------------------------------------X

1:21-CV-10144-PGG-BCM

SUPPLEMENTAL DECLARATION OF
FRANK FOX, PH.D., PURSUANT TO
PARAGRAPHS 7.b & c OF THE
MARCH 3, 2023 CIVIL CASE
MANAGEMENT PLAN AND
SCHEDULING ORDER [DOCKET NO.
50]

## I. Introduction and Definitions

Mr. Michael J. Petron, retained by the law firm Crowell & Moring LLP on behalf of Oxford Health Insurance, Inc. ("Oxford") submitted an Expert Report on January 18, 2024. For this report, Mr. Petron was asked to "review and analyze the data produced to opine on whether it is possible to identify the population of individuals meeting the criteria for membership in Plaintiffs' proposed class" and to "review, analyze, and critique the opinions proffered by Plaintiffs' expert witness Frank G. Fox, Ph.D. ("Dr. Fox") in his declaration submitted December 21, 2023 ("Fox Declaration")."[1]

We disagree with Mr. Petron's conclusions and submit this supplemental declaration to demonstrate that (1) numerosity of the proposed Class can be determined from the claims file alone, and (2) that the estimates within the Fox Declaration are reasonable and reliable.

Definitions

*Proposed Class Definition in the First Amended Complaint*:
"All persons who were covered under an ERISA group health plan underwritten and/or administered by defendant Oxford Health Insurance, Inc., which was issued, amended, or renewed in the State of New York, who were diagnosed with (1) anorexia nervosa, (2) bulimia nervosa, (3) eating disorder not otherwise specified (EDNOS), (4) binge eating disorder (BED), (5) avoidant/restrictive food intake disorder (ARFID) and whose request for authorization or claim for reimbursement for nutritional counseling or dietician services was made between November 30, 2015 and the present ('Class Period') and was denied."[2]

*2021 Reconfiguration by Oxford*
It is my understanding that effective January 1, 2021, Oxford reconfigured its claims processing system to provide additional coverage for nutritional counseling for the treatment of eating disorder diagnoses more broadly.[3]

---

[1] Expert Report of Michael J. Petron, p. 4.
[2] First Amended Complaint, September 16, 2022.
[3] Lisa Gauthier Deposition, p. 54, lines 18-23, and p. 55, lines 1-2.

*Numerosity*

Cases where "The potential members of the proposed Class as defined are so numerous that joinder of all members of the proposed Class is impractical." [4] In my declaration, I was requested to estimate numerosity of the Proposed Class.[5]

## II. Overview

Within his Expert Report, Mr. Petron concludes "it is not possible from the Claims Data to identify the population of individuals meeting the criteria for membership in Plaintiffs' Proposed Class without an individualized review of claims for each potential class member" ("Petron Claim 1").[6] Mr. Petron bases this conclusion on his analysis of OXF0032564, a dataset of Oxford claims with a nutritional counseling procedure code and an eating disorder diagnosis between November 30, 2015 and September 22, 2023. From these claims, Mr. Petron finds that since some claims with the same "Adjustment Description" value had different coverage outcomes, and some claims with a filing deadline past 120 days were paid, that claims were adjudicated on an individual basis.[7] Mr. Petron further opines that since some nutritional counseling claims were denied for reasons outside the nutritional counseling exclusion, and some nutritional counseling claims were denied after the exclusion was lifted, that claims denied due to the exclusion may have been denied anyway.[8] From his opinions that claims were adjudicated on an individual basis and those denied due to the exclusion may have been denied anyway, Mr. Petron concludes that "I do not believe that the Claims Data allows for one to identify a population of individuals whose claims for nutritional counseling services would be covered but for the lack of a nutritional counseling benefit for eating disorder diagnoses."[9]

We disagree with Mr. Petron's conclusion that it is not possible to estimate the population of individuals within the proposed Class from the provided Claims Data without an individualized review of claim files. Hundreds of persons were denied nutritional counseling benefits because these services were "Not a Covered Benefit." Mr. Petron asserts that even if nutritional

---

[4] First Amended Complaint, p. 13.
[5] Declaration of Frank G. Fox, PhD, December 21, 2023, p. 3
[6] Expert Report of Michael J. Petron, p. 42.
[7] Ibid, pp. 18-21.
[8] Ibid, pp. 22-30.
[9] Ibid, p. 30.

counseling was covered, these claims would have been denied for other reasons. However, this adds an additional term to the Class Definition, namely that Class members whose claims were denied because nutritional counseling was "not a covered benefit" also had to show that there were no other conceivable grounds for Oxford to deny their claims to be a member of the Class. This is not required. These persons were denied reimbursement for nutritional counseling because nutritional counseling was not covered, which is all the Class Definition requires. Numerosity of the proposed Class can be determined from the claims file alone. We describe this in more detail below under our Response to Petron Claim 1.

In addition to his opinions on the Oxford claims file, Mr. Petron also concludes "the assumptions described in the Fox Declaration are flawed, contributing to an unreliable estimate of: (1) yearly Oxford members who received nutritional counseling treatment for an eating disorder; and (2) the estimated average allowed amount per unique claim" ("Petron Claim 2").[10] Mr. Petron bases this conclusion on his arguments that:

1. The estimates of treatment for eating disorders and nutritional counseling have large degrees of error and, for nutritional counseling, are drawn from studies that are not relevant to the study population;[11]

2. There are large differences between the number of unique members in the Claims Data files and the estimated unique members from the Fox Declaration, which shows that the latter are unreliable;[12] and

3. Estimating the allowed amount per claim is a poor way to estimate the cost of nutritional counseling services because this statistic has a high degree of variation and is not normally distributed.[13]

We disagree with Mr. Petron that the assumptions used in the Fox Declaration are flawed and contribute to unreliable estimates of the proposed Class. While the estimates of the number of

---

[10] Ibid, p. 42.
[11] Ibid, pp. 31-36.
[12] Ibid, pp. 36-37.
[13] Ibid, pp. 38-42.

4

persons with eating disorders who received nutritional counseling are based on statistics with degrees of uncertainty, they reflect reliable and reasonable estimates of the number of persons who would have submitted claims for nutritional counseling, but for Oxford's constraints on nutritional counseling benefits. We note Mr. Petron does not assert the estimates in the Fox Declaration are wrong, simply that the level of uncertainty in the estimates is unacceptable in his opinion. However, Mr. Petron offers no alternative measures to those in the Fox Declaration. We describe this in more detail below under our Response to Petron Claim 2.

### III. Response to Expert Report of Michael J. Petron

1. **Response to Petron Claim 1: It is not possible from the Claims Data to identify the population of individuals meeting the criteria for membership in Plaintiffs' Proposed Class without an individualized review of claims for each potential Class member.**

   With regards to the first claim, we disagree with Michael Petron that it is not possible to estimate the population of individuals within the proposed Class from the provided claims file and that an individualized review of claims is necessary for such an exercise. Mr. Petron's evaluation of the Claims Data, particularly his claim that the number of members in the proposed Class cannot be identified from the claims file,[14] suffers from several misinterpretations of the data. A non-exhaustive list of key issues I identify in Mr. Petron's response is presented below.

   Petron's analysis largely ignores counts of members affected.

   Mr. Petron's analysis of the Claims Data is principally focused on claims count and whether it meets his definition of an "Allowed" or "Paid" claim where at least one reportable billable event ("event" or "reportable event") within a single claim had a positive allowed amount reported. This leads to Mr. Petron claiming that of the 8,464 total unique claims in the Claims Data, "…6,004 claims do not meet Plaintiffs' class definition because the claims were paid."[15]

---

[14] Ibid, p. 4.
[15] Ibid, p. 18.

Mr. Petron's focus on the count of claims is misleading, as it fails to recognize the number of members **affected** by the nutritional counseling exclusion. Even if one were to use Mr. Petron's expansive definition of an "Allowed" claim, then of the 675 unique members with a date of service before the 2021 Reconfiguration, 413 (61%) of these members did not have any allowed claims during this period. These persons are reported as "Denied" members in Table 1 below. Extending this analysis through the entire November 30, 2015 to September 22, 2023 period, then I estimate there are 430 unique members with a denied claim in the Claims Data.

| Table 1: Member Counts Incorporating Petron "Allowed" Claim Definition | | | | |
|---|---|---|---|---|
| | Unique Member Count | | | Denied as % of Total |
| | Total | Allowed | Denied | |
| | | | | |
| Subtotal: Before 2021 Reconfiguration | 675 | 262 | 413 | 61% |
| | | | | |
| After 2021 Reconfiguration, 2021-2022 | 492 | 429 | 63 | 13% |
| After 2021 Reconfiguration, 2023 | 250 | 232 | 18 | 7% |
| Subtotal: After 2021 Reconfiguration | 638 | 564 | 74 | 12% |
| | | | | |
| Total | 1,222 | 792 | 430 | 35% |

Notes
+Subtotals and Total may not sum as a member can span multiple time periods.
+Allowed member defined as having at least one allowed claim consistent with Petron's definition of an allowed claim (i.e. a claim with at least one reportable event with a positive allowed amount during the corresponding time period).
+Denied member defined as not having any reportable event with a positive allowed amount during the corresponding time period.
Source: OXF0032564

Mr. Petron's definition of an "Allowed" claim is overly expansive. Under Mr. Petron's definition, a member could have multiple reportable events under a claim that are denied and not paid but have one reportable event under the same claim that has a positive allowed amount which would then make the claim in its entirety designated "Allowed." For example, claim # ▇▇▇▇▇▇ had seven distinct reportable events, each event with a distinct date of service. See Table 2. Of these seven reportable events, six of them had an allowed amount of $0 with an adjustment description "NOT A COVERED BENEFIT" while one reportable

event had an allowed amount of $100 with the adjustment description "PAID AT 100% OF UCR". Under Mr. Petron's definition, claim #⬛⬛⬛⬛⬛ would be defined as an "Allowed" claim despite having multiple reportable events denied on the basis of the nutritional counseling exclusion.

| Line No. | CPT Code | Units | Date of Service | Billed Amount | Allowed Amount | Adjustment Description |
|---|---|---|---|---|---|---|
| 1 | 97803 | 4 | ⬛ | $100 | $100 | PAID AT 100% OF UCR |
| 2 | 97803 | 4 | ⬛ | $100 | $0 | NOT A COVERED BENEFIT |
| 3 | 97803 | 4 | ⬛ | $100 | $0 | NOT A COVERED BENEFIT |
| 4 | 97803 | 4 | ⬛ | $100 | $0 | NOT A COVERED BENEFIT |
| 5 | 97803 | 4 | ⬛ | $100 | $0 | NOT A COVERED BENEFIT |
| 6 | 97803 | 4 | ⬛ | $100 | $0 | NOT A COVERED BENEFIT |
| 7 | 97803 | 4 | ⬛ | $100 | $0 | NOT A COVERED BENEFIT |

**Table 2: Select Fields for Claim #⬛⬛⬛⬛⬛**

Source: OXF0032564

In contrast, in my declaration we developed a focused definition of what I designated as a denied claim: a claim with a reportable event with an "Adjustment Description" reported as "NOT A COVERED BENEFIT" or "SERVICES ARE DENIED BECAUSE THEY ARE NOT A COVERED BENEFIT (REMARK CODE CES005)".[16]

Under my definition of a denied claim, we estimate 430 (64%) members had a denied claim before the 2021 Reconfiguration. See Table 3. This compares to the figure of 413 members under Mr. Petron's definition. Extending this analysis through the entire range of claims, we estimate there are 458 unique members that had a denied claim in the Claims Data. Overall, this focused definition results in an additional 28 members with nutritional counseling denials over the entire range of claims.

---

[16] Declaration of Frank G. Fox, PhD, p. 11.

| Table 3: Member Counts Incorporating Fox "Denied" Claim Definition | | | | |
|---|---|---|---|---|
| | **Unique Member Count** | | | **Denied as % of Total** |
| | **Total** | **Allowed** | **Denied** | |
| Subtotal: Before 2021 Reconfiguration | 675 | 245 | 430 | 64% |
| After 2021 Reconfiguration, 2021-2022 | 492 | 461 | 31 | 6% |
| After 2021 Reconfiguration, 2023 | 250 | 250 | 0 | 0% |
| Subtotal: After 2021 Reconfiguration | 638 | 607 | 31 | 5% |
| **Total** | 1,222 | 764 | 458 | 37% |

Notes
+Subtotals and Total may not sum as a member can span multiple time periods.
+Allowed member defined as a member that does not have any claims that meet the Fox definition of denied claim.
+Denied member defined as having at least one denied claim consistent with Fox definition of a denied claim (i.e. a claim with at least one reportable event with an adjustment description of reported as "NOT A COVERED BENEFIT" or "SERVICES ARE DENIED BECAUSE THEY ARE NOT A COVERED BENEFIT (REMARK CODE CES005)" during the corresponding time period).

Source: OXF0032564

In summary, whether using my or Mr. Petron's definition of an allowed or denied claim, the Claims Data demonstrates there were hundreds of members affected by the nutritional counseling exclusion over the course of the study period.

Petron's discussion of other potential denial reasons does not invalidate use of the Claims Data.

Mr. Petron asserts that even if nutritional counseling was covered, then some number of claims would have been denied for other reasons, which invalidates the use of the Claims Data to identify Class members.[17] However, this conjectural hypothetical is meaningless. These persons were denied reimbursement for nutritional counseling benefits because nutritional counseling was not a covered benefit; this is all that is required under Plaintiffs' Class Definition. Mr. Petron obfuscates the Class Definition with his many examples of claim denial reasons, implicitly expanding the proposed Class Definition, while ignoring the

---

[17] Expert Report of Michael J. Petron, pp. 21-29.

8

simple fact that claims for reimbursement were denied for lack of coverage. It should also be noted that the proposed Class Definition includes all persons whose claim for reimbursement for nutritional counseling for an eating disorder was denied. This determination of whether an insured meets the proposed Class Definition is at the billable event level. Mr. Petron also confuses this point, referring to claims, which are different, confusing the numerosity question of insureds.

What we can tell from the Claims Data is that there were over 400 members who had at least some portion of their nutritional counseling claim for an eating disorder not approved throughout the study period, including before the 2021 Reconfiguration. See Table 1 and Table 3. We can also see through direct observation of the adjustment descriptions provided in the Claims Data that over 400 members had adjustment descriptions for reportable events within their claim specifically stating that the denial was due to service not being a covered benefit. In my opinion, by definition, this meets the proposed Class Definition, i.e., persons "…whose request for authorization or claim for reimbursement for nutritional counseling or dietician services was made between November 30, 2015 and the present ('Class Period') and was denied."[18] Even Mr. Petron admits this stating:  "I observed approximately 74.2% of the denied claims prior to the 2021 Reconfiguration were denied on the basis that the services were not a covered benefit."[19] This figure of 74.2% represented 1,352 claims.[20]

Further, based off the numbers in Figure 9 of Mr. Petron's Expert Report, prior to 2021 about 469 claims were denied for reasons which did not include "NOT A COVERED BENEFIT" or "SERVICES ARE DENIED BECAUSE THEY ARE NOT A COVERED BENEFIT (REMARK CODE CES005)." From Figure 4 of Mr. Petron's Expert Report, there were 3,499 unique claims prior to 2021. The proportion of denied claims for "other" reasons was thus about 13.3 percent (469/3,499) of all unique claims prior to 2021. If Mr. Petron were correct and claims denied due to the nutritional counseling exclusion would have been denied for these other reasons anyway, then with the elimination of this exclusion, one should expect a significant expansion in the proportion of claims denied due to these other reasons. In fact,

---

[18] First Amended Complaint, September 22, 2022.
[19] Expert Report of Michael J. Petron, p. 26.
[20] Ibid, Figure 9, p. 25.

the proportion of claims denied after the 2021 reconfiguration fell for these other reasons, from about 13.3 percent to about 12.8 percent (Petron, Figure 4; 1- 4,334/4,975). While not a large decrease, **the fact that this proportion did not increase** following the 2021 Reconfiguration is evidence against Mr. Petron's conjecture.

2. **Response to Petron Claim 2: The assumptions described in the Fox Declaration are flawed, contributing to an unreliable estimate of: (1) yearly Oxford members that received nutritional counseling treatment for an eating disorder; and (2) the estimated average allowed amount per unique claim.**

Mr. Petron, in his January 18, 2024 Expert Report, identified a series of "flaws" in the model of eating disorder prevalence and utilization presented within the December 21, 2023 Fox Declaration. Within the Fox Declaration, this model flows across a series of six tables for covered population, eating disorder prevalence, treatment rates, and proportion of treatment with nutritional counseling. For convenience and to highlight the areas of the model criticized by Mr. Petron, we summarize these six tables for the 2023 covered population in Table 4 below. The summary estimates in Table 4 do not capture the expected annual changes in the age and sex structure of the population but are comparable to the estimates presented in the Fox Declaration for 2023. In addition, some of the rows in Table 4 "roll up" multiple assumptions for prevalence and/or treatment into a single estimate which we have rounded to the neared ten thousandth. This results in slight differences between the numbers, which we identify in the Table 4 notes.

| Table 4: Condensed Eating Disorder Prevalence and Utilization Model for 2023 Covered Population | | |
| --- | --- | --- |
| **Eating Disorder Prevalence and Utilization Model** | **Row** | **Baseline Estimate (2023)** |
| Covered Population | 1 | ████████ |
| Eating disorder prevalence | 2 | ████████ |
| Insured with eating disorders ([1]*[2]) | 3 | 10,438 |
| Utilization of treatment for eating disorders | 4 | 20.72% |
| Insureds utilizing eating disorder treatment ([3]*[4]) | 5 | 2,163 |
| Proportion of treatment with nutritional counseling | 6 | 60.00% |
| Insured utilizing eating disorder treatment with nutritional counseling ([5]*[6]) | 7 | 1,298 |

Notes: See assumptions in Table 5. Estimates reflect 2023 covered population for both sexes. Differences between the model above and the corresponding estimates in Table 4 and Table 6 of the Fox Declaration are due to rounding (10,438 versus 10,451 & 1,298 versus 1,300).

From Table 4, the model starts with the 2023 covered population of ██████ of which about ██████ (10,438) are estimated to have eating disorders. This is analogous to the Fox Declaration Table 4 estimate of 10,451. Of these, 20.72% (2,163) are assumed to receive treatment for their eating disorder in any given year. This statistic, 20.72%, reflects a weighted average of the one-year treatment estimates presented in Table 5 of the Fox Declaration. Of the 2,163 persons receiving treatment for eating disorders, 60% (1,298) of these treatments are assumed to include nutritional counseling. We outline the calculations and assumptions of Table 4 in Table 5.

11

| Row | Assumption |
|---|---|
| **Table 5: Model Assumptions** | |
| 1 | Oxford Health Insurance, Inc. October 13, 2023. SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17 |
| 2 | Based on estimates Table 2.3 from Deloitte Access Economics by condition. The Social and Economic Cost of Eating Disorders in the United States of America: A Report for the Strategic Training Initiative for the Prevention of Eating Disorders and the Academy for Eating Disorders. June 2020. Available at: https://www.hsph.harvard.edu/striped/report-economic-costs-of-eating-disorders/. Estimates weighted by age and sex based on New York demographic structure of the population from U.S Census Annual Estimates of the Resident Population by Single Year of Age and Sex for New York: April 1, 2020 to July 1, 2022 (SC-EST2022-SYASEX-36) |
| 3 | Product of [1] and [2] |
| 4 | Estimate based on one-year treatment rate: Page 11 of Supplementary Online Content appendix to Ward ZJ, Rodriguez P, Wright DR, Austin SB, Long MW. Estimation of Eating Disorders Prevalence by Age and Associations With Mortality in a Simulated Nationally Representative US Cohort. JAMA Netw Open. 2019;2(10):e1912925. doi:10.1001/jamanetworkopen.2019.12925 |
| 5 | Product of [3] and [4] |
| 6 | Nutritional Counseling Adjustment: McMaster, CM, Wade, T, Franklin, J, Waller, G, and Hart, S. Impact of patient characteristics on clinicians' decisions to involve dietitians in eating disorder treatment. J Hum Nutr Diet. 2022; 35: 512–522. https://doi.org/10.1111/jhn.12980 |
| 7 | Product of [5] and [6] |
| Source: Fox Declaration, pp. 5-10. | |

In his January 18, 2024 Expert Report, Mr. Petron takes issue with the assumption in Row 4 for the proportion of persons with eating disorders who would receive treatment, as well as the assumption in Row 6 for the proportion of those persons with treatment who had nutritional counseling. While Mr. Petron may or may not agree with the assumption in Row 2, he did not criticize this statistic. As such, we focus on the assumptions for treatment utilization in Row 4 and Row 6.

Row 4: Assumption for Persons with Eating Disorders Treatment Utilization

The assumption in Row 4 of Table 4 reflects the proportion of persons with eating disorders who would be in treatment in a given year. This would include persons receiving treatment for their eating disorder with and without nutritional counseling. As described on page 7 of the Fox Declaration, the prevalence and utilization model applies the estimates used in Ward et al. (2019), which were derived from estimates from Hudson et al. (2007). As identified by

12

Mr. Petron, these estimates are "point estimates" in that they reflect a single number rather than a range.

Mr. Petron believes these estimates are flawed because the point estimates do not reflect the uncertainty of the estimates,[21] and this use of published research "is unreliable and creates a wide range of values wherein interpreting the results is not useful." [22] In Figure 13 of his expert report, Mr. Petron reproduces the estimates from the Fox Declaration using the "Lower Bound" and "Upper Bound" estimates from Ward et al. (2019) which he identifies as a 95% confidence interval. However, this is an incorrect and inappropriate use of the estimates from Ward et al. (2019).

These rates reflect a "best estimate" and must be sensibly applied. Ward et al. (2019) applied these treatment rates within their own model to estimate the risk of remission and presented upper and lower bounds of these estimates. However, while these bounds are reflective of the uncertainty of the point estimate, they are not "Confidence Intervals" as stated by Mr. Petron and should not be applied as such.[23] It is illustrative to present the estimates from Hudson et al. (2007) on which the Ward et al. (2019) figures are based. Hudson et al. (2007) does present the standard errors, so it is possible to estimate the 95% Confidence Interval for selected statistics. We present these estimates and their confidence intervals both for the 12-month and lifetime treatment rates, in Table 6 and Table 7.

---

[21]Expert Report of Michael J. Petron, pp. 31-34.
[22] Ibid, p. 36.
[23]The actual confidence intervals for these eating disorder treatment rates are included in Table 6. Some of these figures are clearly different from those described by Mr. Petron, in his Expert Report. See for example, paragraph 68, p. 33, Petron Expert Report, where he states the confidence interval for bulimia nervosa 12-month treatment for females is between 0% and 37%. This is incorrect.

**Table 6: 12-Month Treatment of DSM-IV Eating Disorders by Sex**

| 12-Month Treatment of DSM-IV for Females | 12-month Treatment Rate | | | |
|---|---|---|---|---|
| | Point Estimate | SE | 95% CI | |
| | | | Lower | Upper |
| Anorexia Nervosa | * | * | * | * |
| Bulimia Nervosa | 17.1% | 0.102 | -2.9% | 37.1% |
| Binge-Eating Disorder | 31.6% | 0.107 | 10.6% | 52.6% |

| 12-Month Treatment of DSM-IV ED for Males | 12-month Treatment Rate | | | |
|---|---|---|---|---|
| | Point Estimate | SE | 95% CI | |
| | | | Lower | Upper |
| Anorexia Nervosa | * | * | * | * |
| Bulimia Nervosa | 0.0% | * | * | * |
| Binge-Eating Disorder | 21.5% | 0.152 | -8.3% | 51.3% |

Source: Hudson JI, Hiripi E, Pope HG Jr, Kessler RC. The prevalence and correlates of eating disorders in the National Comorbidity Survey Replication. Biol Psychiatry. 2007;61(3):348-358. doi:10.1016/j.biopsych.2006.03.040, Table 8b and Table 8c.
Notes: Cells with * indicate statistics which were not calculable. Within the NCS-R, there were no respondents with 12-month Anorexia Nervosa, and no men with Bulimia Nervosa who received treatment, so it was not possible to calculate annual treatment rates and standard errors for these variables.

**Table 7: Lifetime Treatment of DSM-IV Eating Disorders by Sex**

| Lifetime Treatment of DSM-IV ED for Females | Lifetime Treatment Rate | | | |
|---|---|---|---|---|
| | Point Estimate | SE | 95% CI | |
| | | | Lower | Upper |
| Anorexia Nervosa | 29.8% | 0.137 | 2.9% | 56.7% |
| Bulimia Nervosa | 47.0% | 0.085 | 30.3% | 63.7% |
| Binge-Eating Disorder | 50.8% | 0.069 | 37.3% | 64.3% |

| Lifetime Treatment of DSM-IV ED for Males | Lifetime Treatment Rate | | | |
|---|---|---|---|---|
| | Point Estimate | SE | 95% CI | |
| | | | Lower | Upper |
| Anorexia Nervosa | 50.2% | 0.251 | 1.0% | 99.4% |
| Bulimia Nervosa | 29.1% | 0.193 | -8.7% | 66.9% |
| Binge-Eating Disorder | 28.9% | 0.094 | 10.5% | 47.3% |

Source: Hudson JI, Hiripi E, Pope HG Jr, Kessler RC. The prevalence and correlates of eating disorders in the National Comorbidity Survey Replication. Biol Psychiatry. 2007;61(3):348-358. doi:10.1016/j.biopsych.2006.03.040, Table 8b and Table 8c.

The 12-month treatment rates presented in Table 6 were used to construct the treatment assumptions in Ward et al (2019), which in turn were applied within the model in the Fox Declaration. The NCS-R, which Hudson et.al. (2007) used in their study, surveyed 9,282 persons over a two-year period, so small sample sizes prevented the estimation of some of the cells. For example, there were no respondents with 12-month Anorexia Nervosa, so it was not possible for Hudson et al. (2007) to calculate 12-month treatment rates for these persons. Furthermore, a straightforward calculation of a 95% Confidence Interval results in a negative lower bound estimate, which does not make sense in the context of treatment rates. A mismatch between a mathematical calculation like a Confidence Interval and the realistic possibilities of a variable is common in statistics, and reinforces the fact that statistics must be sensibly applied and judged against existing knowledge.

Ward et al. (2019) addressed this problem by setting a lower bound of zero and using reasonable proxies for these statistics. Specifically, they assumed (1) the ratio of 12-month to lifetime prevalence for Anorexia Nervosa was equal to the average of the corresponding ratios for Bulimia Nervosa and Binge-Eating Disorder (about 50%), and (2) that the rate of persons with Other Specified Feeding or Eating Disorder receiving treatment was equal to that of Anorexia Nervosa. These proxies are imperfect, but within the context of the research literature documenting treatment rates for persons with eating disorders, are reasonable. It was for that reason we applied these rates within the Fox Declaration model. We would note that this method of Ward et al. (2019), of applying previously published estimates as parameters in a new model, a method analogous to that in the Fox Declaration, is common and accepted in academic literature.

Mr. Petron misinterprets the Ward et al (2019) bounds as Confidence Intervals, and blindly applies the lower bound across all the specified eating disorder types. This is incorrect and inconsistent with the lifetime treatment rates estimated by Hudson et al. (2007). By the reasoning of Mr. Petron, it is plausible to expect that no persons with Anorexia Nervosa or

Bulimia Nervosa would ever seek treatment for their condition. Based on the lifetime treatment estimates from Hudson et al. (2007), the odds of this are less than a thousandth of a percent.[24] The existing literature on eating disorders similarly refutes such a conclusion.

Mr. Petron is correct that the estimates presented Table 6 and Table 7 are estimated with uncertainty, and that this results in uncertainty in the estimate of utilization of treatment for eating disorders applied in the model of the Fox Declaration. However, he is wrong that this uncertainty results in an "unreliable estimate" of treatment for eating disorders which "is not useful." [25] Rather, this estimate must be judged in the context of the existing literature and its reasonableness as an overall metric of 20.72% considered. We present estimates of overall treatment rates from four other studies in Table 8.

| Table 8: Alternative Treatment Estimates from Eating Disorder Literature | | | | |
|---|---|---|---|---|
| Article | Treatment Rate | Reporting Year* | Note | |
| Hart et al. (2011) | 23.2% | 2007 and prior | Meta-study of 14 articles; Pooled proportion seeking treatment | |
| Termorshuizen et al. (2020) | 55.0% | 2020 | Percent of surveyed currently receiving treatment, U.S. only | |
| Ali et al. (2020) | 22.4% | 2016/2017 | Current treatment rate of surveyed persons | |
| Griffiths et al. (2015) | 55.0% | 2014 | Percent of surveyed currently receiving treatment | |
| Sources: Ali et al. 2020. What prevents young adults from seeking help? Barriers toward help-seeking for eating disorder symptomatology. International Journal of Eating Disorders; Hart et al. 2011. Unmet need for treatment in the eating disorders: A systematic review of eating disorder specific treatment seeking among community cases. Clinical Psychology Review, Vol 31; 727-735; Griffiths et al. 2015. Self-stigma of seeking treatment and being male predict an increased likelihood of having an undiagnosed eating disorder. International Journal of Eating Disorders, Vol 48(6); 775-778; Termorshuizen et al. 2020. Early impact of COVID-19 on individuals with self-reported eating disorders: A survey of 1,000 individuals in the United States and the Netherlands. International Journal of Eating Disorders. Notes: *Reporting year based on best assessment of when the survey was conducted. If unknown, reporting year was chosen as year prior to publication. | | | | |

---

[24] Probability based on lifetime treatment rate of 43.2% and SE of 0.097 for Bulimia Nervosa from Table 8a of Hudson et al. (2007).
[25] Expert Report of Michael J. Petron, p. 36.

In addition to the studies by Hudson et al. (2007) and Ward et al. (2019), in Table 8 we list four other studies which present estimates of current-year treatment rates for persons with eating disorders. These include Hart et al. (2011), Temorshuizen et al. (2020), Ali et al. (2020), and Griffiths et al. (2015). These include data from surveys of solicited participants (Ali et al. 2020, Temorshuizen et al. 2020, and Griffiths et al. 2015) and a meta-study of fourteen published articles (Hart et al. 2011). Estimates from these articles are based on surveys from participants across different ages, different time periods, and from different countries, and vary in their definitions of eating disorders and treatment. As with Hudson et al. (2007) or Ward et al. (2019), the estimates from any single study will have limitations in terms of how the population was selected, surveyed, or studied. However, taken together, these estimates form a reliable and reasonable basis for the assumption of an eating disorder treatment rate of about 20%. It is pertinent that Mr. Petron provides no alternative estimates of treatment rates in his Expert Report, limiting his criticism to the precision of the estimates, rather than the estimates themselves.

Row 6: Assumption for Persons with Eating Disorders Treatment Utilization

The assumption in Row 6 of Table 4 reflects the proportion of eating disorder treatments which would include nutritional counseling. This proportion could range from 0%, where treatment for eating disorders would never include nutritional counseling, to 100%, where nutritional counseling is always a part of treatment for persons with eating disorders. The model in the Fox Declaration chose a rate of 60% based on a survey of clinicians who reported that an average of 60% of eating disorder patients are referred to a dietician.[26]

From the American Psychiatric Association's Practice Guidelines, nutritional counseling with registered dieticians is recommended in combination with other therapies for the treatment of Anorexia Nervosa, Bulimia Nervosa, Binge-Eating Disorder, and other eating disorders.[27] Furthermore, eating disorder advocacy and healthcare organizations identify registered

---

[26] Declaration of Frank G. Fox, PhD, p. 7.
[27] American Psychiatric Association. 2023. Practice Guideline for the Treatment of Patients with Eating Disorders, Fourth Edition. https://psychiatryonline.org/doi/epdf/10.1176/appi.books.9780890424865. Last Accessed February 6, 2024.

dieticians as typically included in eating disorder treatment plans.[28] Based on the recommendations of the American Psychiatric Association ("APA") and statements from the Mayo Clinic and others, it would be reasonable to choose a nutritional counseling rate at or close to 100%. However, while these may be the existing practice recommendations, eating disorder treatment depends on the disorder and the patient, and some providers may not directly adhere to APA guidelines.

In practice, there are few studies which explicitly estimate how often treatment for eating disorders includes nutritional counseling. However, a study from 2008 reported that 67.9% of providers registered with the Academy for Eating Disorders, "Always" or "Almost Always" included nutritional counseling in eating disorder treatment and that 7.9% of providers included it "Never" or "Almost Never."[29] More recently, McMaster et al. (2022) surveyed clinicians in Australia to explicitly estimate how often dietetic treatment was included in eating disorder treatment. From this survey of clinicians, about 60% of patients were typically referred to a dietician.[30]

Mr. Petron levies a series of critiques related to McMaster et al. (2022), and thus the use of the 60% rate of treatments in Row 6 of Table 4. These include:

- The paper was published by a British medical journal and reflective of medical practices in Europe and the UK, and there is no information in the Fox Declaration regarding whether US-based treatment patterns are similar.[31]
- The paper surveyed only 57 clinicians recruited through Australian eating disorder organizations, which is not convincing for a covered population in New York.[32]

---

[28] See, for example, The Mayo Clinic (https://www.mayoclinic.org/diseases-conditions/eating-disorders/in-depth/eating-disorder-treatment/art-20046234), Eating Disorder Hope (https://www.eatingdisorderhope.com/nutrition-counseling-eating-disorders), and National Eating Disorders Association (https://www.nationaleatingdisorders.org/treatment/).
[29] Simmons et al. 2008. Factors Influencing the Utilization of Empirically Supported Treatments for Eating Disorders. Eating Disorders: The Journal of Treatment & Prevention, Vol 16(4): 342-354.
[30] McMaster, CM, Wade, T, Franklin, J, Waller, G, and Hart, S. Impact of patient characteristics on clinicians' decisions to involve dietitians in eating disorder treatment. J Hum Nutr Diet. 2022; 35: 512–522. https://doi.org/10.1111/jhn.12980.
[31] Expert Report of Michael J. Petron, p. 35.
[32] Ibid.

- The survey did not include case vignettes with diagnoses other than anorexia or bulimia, so is not relevant to Binge-Eating Disorder or Other Specified Eating Disorder. [33]

As with his criticism of the Row 4 Assumption, Mr. Petron provides no alternative estimates of nutritional counseling rates in his Expert Report, limiting his criticism to the source of the statistic. However, as noted above, while any single study will have limitations related to how the population was selected, surveyed, or studied, it may nevertheless provide a reasonable basis for a parameter assumption if it is sensibly applied. With regards to McMaster et al. (2022), this 60% is based off surveys of providers in Australia. As late as 2017, unlike the American Psychiatric Association in the United States, The Royal Australian and New Zealand College of Psychiatrists did not recommend nutritional counseling for the treatment of eating disorders.[34] As such, this rate of 60% is likely an underestimate relative to standard practice in the United States. Furthermore, it is consistent with the estimates within Simmons et al. (2008), and reasonable given that nutritional counseling is recommended by the American Psychiatric Association to be included in treatment for eating disorders. As stated in the Fox Declaration, we did find one other article which reported the frequency of nutritional counseling within eating disorder treatment, which was calculated to be about 24% of the time.[35] While based on older research and from a period in which treatment recommendations may have differed, this rate could be reasonable if nutritional counseling was selectively excluded from coverage for eating disorder treatment, as was the case with Oxford insureds prior to 2021.

Mr. Petron's criticism that the McMaster et al. survey is not relevant to Binge-Eating Disorder or Other Specified Eating Disorder is wrong. According to McMaster et al., its "*Survey questions were divided into four sections: (1) clinician background and demographics; (2) clinician characteristics; (3) clinician beliefs about dietitians; and (4) case vignettes.*"[36] The 60% dietician referral rate is based on findings from survey question

---

[33] Ibid, pp. 35-36.

[34] Hilbert et al. 2017. Evidence-based clinical guidelines for eating disorders: international comparison. Curr Opin Psychiatry, Vol 30:423–437.

[35] Declaration of Frank G. Fox, PhD, p. 10.

[36] McMaster et al., p. 4.

#9 "*What percentage (0-100%) of your eating disorder patient load would you typically refer to a dietitian?*" in section (1) related to clinical background and demographics.[37] Mr. Petron's criticism is irrelevant, as it is regarding an entirely different section of the survey, section (4) related to the case vignettes.

In summary, Mr. Petron criticizes the sources behind the assumptions in Row 4 and Row 6 of Table 4, but does not state whether he thinks the numbers themselves are unreasonable or provide an alternative against which these numbers should be judged.

<u>Consistency of the Claims Data with the Fox Declaration Model Conclusions</u>

In my declaration, I recognize there are differences between the number of persons presented in the Claims Data and my estimating models of eating disorder prevalence and nutritional counseling treatment: "These differences could result from many factors, but I hypothesize a key element of this difference is the knowledge by Oxford insureds that over most of the Study Period, nutritional counseling for eating disorders was not a covered service. Thus, many insureds would be less likely to submit a claim for a service they expect would be denied." [38]

Petron misconstrues my declaration when he asserts "*Contrary to Dr. Fox's hypothesis, the Claims Data includes numerous instances of Oxford members with claims for nutritional counseling for eating disorders.*" [39] We first address this statement by Mr. Petron that the behavior of Oxford insureds submitting claims prior to 2021 "contradicts Dr. Fox's hypothesis." This assertion is incorrect. The existence of members with eating disorders who submitted claims for nutritional counseling, despite it not being a covered service, does not contradict the numbers estimated in Table 4.

---

[37] McMaster et al., Supplementary File 1, p. 3.
[38] Declaration of Frank G. Fox, PhD, p. 13.
[39] Expert Report of Michael J. Petron, p. 6.

First. my Declaration already acknowledged that there were claims by members before the 2021 reconfiguration. See Table 3, above, or Table 9 of my Declaration.[40] Second, the presence of claims by members before the 2021 Reconfiguration in the Claims File is not inconsistent with anything stated in my Declaration. Some number of insureds with eating disorders could well have submitted claims for nutritional counseling hoping for full or partial reimbursement. That obviously did happen and is certainly not inconsistent with my Declaration. However, the important point is that the Claims File would include fewer reimbursement requests for nutritional counseling for an eating disorder than if there had not been an insurance exclusion. i.e., if there had been effective insurance coverage for nutritional counseling for an eating disorder that insureds were aware of. That was not the case with Oxford insureds.

The impact of effective insurance coverage on demand for healthcare, including for nutritional counseling for an eating disorder, is based on the well supported phenomenon of the insurance effect which I reference in my Declaration: "*Economists use the term "insurance effect" when there are insurance barriers limiting or excluding coverage for certain conditions/treatments. It arises when people either do not have insurance or they do not have insurance coverage for certain conditions and/or treatments. When this occurs, such persons will demand less services/treatments than they would have if they had effective insurance, i.e., insurance coverage that included such service and/or treatment. Insurance changes the demand for care; there exists a strong and positive relationship between healthcare utilization and insurance coverage. This relationship has been documented extensively in the economics literature and is widely accepted*."[41]

In fact, the effect of the change in insurance coverage is evident in the Claims Data, where the number of unique members with eating disorders who submitted claims for nutritional counseling went from 0.023% of total enrollment (2016 to 2020) to 0.046% of total enrollment (2021 to September 2023). This represented a doubling of unique members who

---

[40] Declaration of Frank G. Fox, PhD, p. 13.
[41] Ibid, p. 10. See footnote 9.

submitted claims between the pre- and post-reconfiguration periods. That demonstrates the insurance effect.

Mr. Petron also argues the 2023 coverage year, with its 250 unique members who submitted nutritional counseling claims over the January to September period, is reflective of a population which was never subject to the nutritional counseling exclusion,[42] and, since 250 is significantly lower than 1,300, this "Baseline estimate is clearly incorrect."[43]

The increase in unique members submitting claims following the 2021 reconfiguration is significant, however these numbers are still far below those estimated in the Fox Declaration. The 250 unique members in 2023, for example, is about 20% of the 1,298 insureds estimated in Table 4. That said, this does not show the Baseline Estimate in the Fox Declaration is incorrect. As described above, this Baseline Estimate was constructed using assumptions for prevalence and utilization which would exist in an insured population with full coverage for the considered services, coverage that was known by insureds.

While nutritional counseling for eating disorders was no longer excluded in 2023, and the Certificates of Coverage updated, the Oxford insured population could well still be affected by the legacy of the exclusion and other actions or inaction by Oxford. For one, many of the Oxford insureds would have been enrolled in prior years during which the nutritional counseling exclusion was in effect. If these insureds failed to read the updated Certificates of Coverage, they could have simply assumed it remained so excluded. Furthermore, the exclusion may have pushed insureds or their providers to use out-of-network nutritional counseling services, and then continued to use these out-of-network services even after the 2021 Reconfiguration. Relatedly, the adequacy of the provider network may also be an issue constraining access to nutritional counseling services. My Declaration implicitly assumes adequate provider networks.

---

[42] Expert Report of Michael J. Petron, pp. 36-37.
[43] Ibid, p. 37.

In summary, rather than demonstrating that the estimates in the Fox Model are incorrect, the Claims Data show a substantial increase in utilization following the 2021 reconfiguration, but that this utilization still falls below what would be expected in an insured population with full coverage.

Estimating the Average Amount Allowed per Claim as a Measure of the Potential
Reimbursement Amount for Denied Claims

In Oxford's October 13, 2023 Defendant's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, in a Supplemental Response to Interrogatory 10, Oxford states:

> "Oxford responds that the estimated potential reimbursement amount for the ███████████████████████████. Oxford bases the potential reimbursement amount on the average reimbursed amount for approved nutritional counseling claims for the treatment of eating disorders with dates of service on and after January 1, 2021."[44]

This corresponds to an average allowed amount of about ████████████[45]

The estimates of Average Allowed Amounts in the Fox Declaration attempted to validate the numbers provided by Oxford in its supplemental response. As stated in the Fox Declaration, based on the provided Claims Data, "the average allowed amount per unique claim after January 1, 2021, excluding denied claims and claims with ████████████[46] We were thus unable to replicate the calculations by Oxford, and arrived at a number about 32% lower.

Mr. Petron criticizes the use of the Average Allowed Amount per Claim to determine Oxford's potential reimbursement, although this was Oxford's own method as presented in its supplemental responses. In his Expert Report, Mr. Petron states: "…basing his calculation of

---

[44] Defendant's Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories, October 13, 2023, pp. 6-7.
[45] ████████/1,360 = ████████.
[46] Declaration of Frank G. Fox, PhD, p. 13.

the average allowed amount per unique claim on the population of claims in the Claims Data…fails to acknowledge the variability of allowed amounts across individual claims for nutritional counseling services," and this "estimate is misleading and unreliable, depending on the application he intended."[47] We emphasize again, this was the method of Oxford in its October 13, 2023 Supplemental Response.

The favored method by Mr. Petron is to separately estimate the amount per unit by CPT code to "address the significant variation in allowed amounts across all claims for nutritional counseling after the 2021 Reconfiguration."[48] Without commenting on whether the method outlined by Mr. Petron is superior to the method applied by Oxford in its supplemental responses, we would simply note that these two methods are not comparable without also estimating the number of units per claim. Mr. Petron estimates an average allowed amount per unit of ▮▮▮▮[49] however there are *__multiple units per claim__*. After the 2021 Reconfiguration there was an overall average of 4.47 units per claim. The estimate from Mr. Petron is an "average of the average" allowed amount per reportable event, so yields an estimate of about ▮▮▮▮ for the average allowed amount per claim and is not reflective of the population average.[50] The overall *average allowed amount per unit* after the 2021 Reconfiguration is ▮▮▮▮[51] The product of the ▮▮▮▮ average allowed amount per unit and 4.47 units per claim yields the average allowed amount per claim of ▮▮▮▮, which matches the estimate in the Fox Declaration.

I declare under penalty of perjury under the laws of the State of New York and the United States that the foregoing is true and correct. Executed this 20<u>th</u> day of February 2024 at Shoreline, Washington.

By: _____*Frank Fox, PhD*_____

Frank G. Fox, Ph.D.

---

[47] Expert Report of Michael J. Petron, pp. 38-39.
[48] Ibid, p. 39.
[49] Ibid, p. 41.
[50] ▮▮▮▮ * 4.47 = ▮▮▮▮
[51] Total of ▮▮▮▮ in total allowed divided by 19,353 units. Figures from OXF0032564 claims file.

## References

1. Ali, Kathina, Daniel B. Fassnacht, Louise Farrer, Elizabeth Rieger, Johannes Feldhege, Markus Moessner, Kathleen M. Griffiths, and Stephanie Bauer. 2020. What prevents young adults from seeking help? Barriers toward help-seeking for eating disorder symptomatology. International Journal of Eating Disorders, Vol. 53(6): 894-906.

2. American Psychiatric Association. 2023. Practice Guideline for the Treatment of Patients with Eating Disorders, Fourth Edition. https://psychiatryonline.org/doi/epdf/10.1176/appi.books.9780890424865, Last Accessed February 6, 2024.

3. Deloitte Access Economics. The Social and Economic Cost of Eating Disorders in the United States of America: A Report for the Strategic Training Initiative for the Prevention of Eating Disorders and the Academy for Eating Disorders. June 2020. Available at: https://www.hsph.harvard.edu/striped/report-economic-costs-of-eating-disorders/.

4. Fox, Frank G. Declaration of Frank G. Fox, PhD. December 21, 2023. 1:21-CV-1044-PGG.

5. Gauthier, Lisa. November 29, 2023 Deposition of Lisa Gauthier. 1:21-CV-1044-PGG.

6. Griffiths, Scott, Jonathan M. Mond, Zhicheng Li,Sanduni Gunatilake, Stuart B. Murray, Jeanie Sheffield, and Stephen Touyz. 2015. Self-Stigma of Seeking Treatment and Being Male Predict an Increased Likelihood of Having an Undiagnosed Eating Disorder. International Journal of Eating Disorders, Vol 48: 775-778.

7. Hart, Laura M., Teresa Granill, Anthony F. Jorm, and Susan J. Paxton. 2011. Unmet need for treatment in the eating disorders: A systematic review of eating disorder specific treatment seeking among community cases. Clinical Psychology Review, Vol. 31(2011): 727-735.

8.  Hilbert, Anja, Hans W. Hoek, and Ricarda Schmidt. 2017. Evidence-based clinical guidelines for eating disorders: international comparison. Current Opinions in Psychiatry, Vol. 30: 423-437.

9.  Hudson JI, Hiripi E, Pope HG Jr, Kessler RC. The prevalence and correlates of eating disorders in the National Comorbidity Survey Replication. Biol Psychiatry. 2007;61(3):348-358. doi: 10.1016/j.biopsych.2006.03.040.

10. McMaster, CM, Wade, T, Franklin, J, Waller, G, and Hart, S. 2022. Impact of patient characteristics on clinicians' decisions to involve dietitians in eating disorder treatment. J Hum Nutr Diet. 2022; 35: 512–522. https://doi.org/10.1111/jhn.12980.

11. Molly C., and Naomi L., et.al, Plaintiffs v. Oxford Health Insurance, Inc, Defendant, 1:21-CV-1044-PGG, First Amended Complaint, September 16, 2022.

12. OXF0032564 (Excel File).

13. Oxford Health Insurance, Inc. October 13, 2023. SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17.

14. Petron, Michael J. Expert Report of Michael J. Petron. January 18, 2024. 1:21-CV-1044-PGG.

15. Simmons, Angela M., Suzanne M. Milnes, and Drew A. Anderson. 2008. Factors influencing the utilization of empirically supported treatments for eating disorders. Eating Disorders: The Journal of Treatment and Prevention, Vol. 16(4): 342-354.

16. Supplementary Online Content appendix to Ward ZJ, Rodriguez P, Wright DR, Austin SB, Long MW. Estimation of Eating Disorders Prevalence by Age and Associations With Mortality in a Simulated Nationally Representative US Cohort. JAMA Netw Open. 2019;2(10): e1912925. doi:10.1001/jamanetworkopen.2019.12925.

17. Termorshuizen, Jet D., Hunna J, Watson, Laura M. Thornton, Stina Borg, Rachael E. Flatt, Casey M. MacDermod, Laura E. Harper, Eric F. van Furth, Christine M. Peat, and Cynthia M. Bulik. 2020. Early impact of COVID-19 on individuals with self-reported eating disorders: A survey of ~1,000 individuals in the United States and the Netherlands. International Journal of Eating Disorders. Vol. 53(11): 1780-1790.

## **PROOF OF SERVICE**

I, Wendy Castillo, declare as follows:

   I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 19839 Nordhoff Street, Northridge, CA 91324.

   On February 20, 2024, I served the foregoing document described as: PLAINTIFFS' SUPPLEMENTAL DISCLOSURE OF EXPERT WITNESSES PURSUANT TO PARAGRAPH 7.b & c. OF THE MARCH 3, 2023 CIVIL CASE MANAGEMENT PLAN AND SCHEDULING ORDER [DOCKET NO. 50] on the interested parties in this action by serving a copy thereof in a sealed envelope addressed as  follows:

| | |
|---|---|
| Sarah Michelle Gilbert<br>CROWELL & MORING LLP<br>590 Madison Avenue, 20th Floor<br>New York, NY 10022<br>sgilbert@crowell.com<br>Attorneys for Defendants<br>Oxford Health Insurance, Inc.<br>Christopher Flynn (admitted *pro hac vice*) | Lauren Nunez (admitted *pro hac vice*)<br>Samuel Ruddy<br>CROWELL & MORING LLP<br>1001 Pennsylvania Avenue NW<br>Washington, DC 20004-2595<br>cflynn@crowell.com<br>lnunez@crowell.com<br>sruddy@crowell.com<br>Attorneys for Defendants<br>Oxford Health Insurance, Inc. |
| Andrew Holmer<br>CROWELL & MORING LLP<br>515 South Flower Street, 40th Floor<br>Los Angeles, CA 90071<br>aholmer@crowell.com<br>Attorneys for Defendants<br>Oxford Health Insurance, Inc. | |

[x] (BY E-MAIL) I caused the above document to be sent via e-mail to the following email addresses: sgilbert@crowell.com, cflynn@crowell.com, lnunez@crowell.com,aholmer@crowell.com, sruddy@crowell.com.

[ ]  (STATE) I declare under penalty of perjury under the Laws of the State of California that the foregoing is true and correct.

[X] (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

   Executed on February 20, 2024, at Canoga Park, California.

_____*/s/ Wendy Castillo*_____
Wendy Castillo

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MOLLY C. and NAOMI L.,
Plaintiffs,

- v -

Case No. 1:21-cv-10144-PGG

OXFORD HEALTH INSURANCE, INC.,
Defendant.

## DEFENDANT'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Oxford Health Insurance, Inc. ("Oxford"), by and through its undersigned

counsel, and pursuant to and in accordance with Federal Rule of Civil Procedure 33, hereby

submits its first amended responses and objections to Plaintiffs' First Set of Interrogatories (the

"Interrogatories").

As agreed by the parties at an August 25, 2023 meet and confer, the responses and

objections herein amend and replace Oxford's responses and objections to Interrogatory Nos. 2,

10, 11, 14, 15, 16, 17, 20, 21, 22, and 24.

## GENERAL RESPONSES AND OBJECTIONS

Oxford reasserts and incorporates by reference all General Responses and Objections set

forth in its July 12, 2023 Responses and Objections to Plaintiffs' First Set of Interrogatories.

## SPECIFIC RESPONSES AND OBJECTIONS

Subject to and without waiving its General Responses and Objections, which are hereby

incorporated into each of the Specific Responses and Objections below, Oxford responds to

Interrogatory Nos. 2, 10, 14, 15, 16, 17, 20, 21, 22, and 24 as follows:

1

CONFIDENTIAL

## INTERROGATORY NO. 2:

Please state the number of OXFORD SUBSCRIBERS or MEMBERS who (1) meet the Class Definition in this case:

All persons who were covered under an ERISA group health plan underwritten and/or administered by defendant Oxford Health Insurance, Inc., which was issued, amended, or renewed in the State of New York , who were diagnosed with (1) anorexia nervosa, (2) bulimia nervosa, (3) eating disorder not otherwise specified (EDNOS), (4) binge eating disorder (BED), or (5) avoidant/restrictive food intake disorder (ARFID) and whose request for authorization or claim for reimbursement for nutritional counseling or dietician services was made between November 30, 2015 and the present ("Class Period") and was denied.

And (2)  submitted requests for claim reimbursement for NUTRITIONAL COUNSELING only, and not requests for authorization.

## RESPONSE TO INTERROGATORY NO. 2:

Oxford objects to this Interrogatory on the grounds that the term "requests for authorization" is vague and ambiguous. Oxford further objects to this Interrogatory as overbroad, unduly burdensome, and irrelevant to the claims and defenses in this case because it requests information regarding "requests for authorization" when members were not required to request prior authorization for outpatient nutritional counseling services during the relevant time period.

Subject to and without waiving its objections, Oxford responds that 451 unique members had a claim for nutritional counseling services for the treatment of an eating disorder, as defined by Interrogatories, with dates of service between November 30, 2015 and September 16, 2022, denied on the basis that the service was not a covered benefit. As noted in Oxford's Response to Interrogatory No. 1, outpatient nutritional counseling services were not subject to prior authorization requirements during the relevant time period.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:

Subject to and without waiving its objections, Oxford revises its prior response to respond that 427 unique members had a claim for nutritional counseling services for the treatment of an eating disorder, as defined by the Interrogatories, with dates of service between

2

November 30, 2015 and September 22, 2023, denied on the basis that the service was not a covered benefit.

Oxford further refers to OXF0032564, which contains records of claims submitted to Oxford for nutritional counseling services for dates of service November 30, 2015 to September 23, 2023 for members with anorexia nervosa, bulimia nervosa, EDNOS, BED, or ARFID.

## INTERROGATORY NO. 10:

From November 30, 2015 to the present, how many claims for reimbursement for NUTRITION COUNSELING were submitted?

## RESPONSE TO INTERROGATORY NO. 10:

Oxford objects to this Interrogatory as overbroad and irrelevant to the claims and defenses in this case to the extent that it seeks information regarding claims for nutritional counseling for the treatment of behavioral health conditions other than eating disorders, as defined by the Interrogatories. Oxford further objects to this Interrogatory as overbroad and irrelevant to the claims and defenses in this case to the extent that it requests information for claims that were denied for reasons other than that nutritional counseling services for eating disorders was not a covered benefit. Oxford further objects to this Interrogatory as overbroad and irrelevant to the claims and defenses in this case to the extent that it requests information regarding claims for nutritional counseling that were approved, and therefore are not at issue in this litigation.

Subject to and without waiving its objections, Oxford responds that 1,429 claims for outpatient nutritional counseling services for eating disorders, as defined in the Interrogatories, with dates of service November 30, 2015 through September 16, 2022, were submitted and denied on the basis that the service was not a covered benefit.

3

CONFIDENTIAL

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

Subject to and without waiving its objections, Oxford revises its Response to

Interrogatory No. 10 to state that 1,360 claims for outpatient nutritional counseling services for

eating disorders, as defined in the Interrogatories, with dates of service November 30, 2015

through September 23, 2023, were submitted and denied on the basis that the service was not a

covered benefit (the "denied claims").  *See* OXF0032564.

Oxford further responds that 8,464 claims were submitted for outpatient nutritional

counseling services for eating disorders, as defined in the Interrogatories, with dates of service

November 30, 2015 through September 22, 2023 (the "total claims").  *Id.*

**INTERROGATORY NO. 11:**

With respect to YOUR answer to Interrogatory No. 10, how many unique
SUBSCRIBERS or MEMBERS submitted those claims?

**RESPONSE TO INTERROGATORY NO. 11:**

Oxford objects to this Interrogatory as overbroad and irrelevant to the claims and

defenses in this case to the extent that it seeks information regarding claims for nutritional

counseling for the treatment of behavioral health conditions other than eating disorders, as

defined by the Interrogatories. Oxford further objects to this Interrogatory as overbroad and

irrelevant to the claims and defenses in this case to the extent that it requests information for

claims that were denied for reasons other than that nutritional counseling services for eating

disorders was not a covered benefit. Oxford further objects to this Interrogatory as overbroad and

irrelevant to the claims and defenses in this case to the extent that it requests information

regarding claims for nutritional counseling that were approved, and therefore are not at issue in

this litigation.

Subject to and without waiving its objections, Oxford responds that 451 unique Oxford

4

members submitted the claims referred to in Oxford's Response to Interrogatory No. 10.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

Subject to and without waiving its objections, Oxford responds that that 427 unique

Oxford members submitted the 1,360 denied claims. Oxford responds further that 1,222 unique

Oxford members submitted the 8,464 total claims.

## INTERROGATORY NO. 14:

With respect to YOUR answer to Interrogatory No. 10, what was the total dollar amount
billed to YOU for those claims?

## RESPONSE TO INTERROGATORY NO. 14:

Oxford objects to this Interrogatory as overbroad and irrelevant to the claims and

defenses in this case to the extent that it seeks information regarding claims for nutritional

counseling for the treatment of behavioral health conditions other than eating disorders, as

defined by the Interrogatories. Oxford further objects to this Interrogatory as overbroad and

irrelevant to the claims and defenses in this case to the extent that it requests information for

claims that were denied for reasons other than that nutritional counseling services for eating

disorders was not a covered benefit. Oxford further objects to this Interrogatory as overbroad and

irrelevant to the claims and defenses in this case to the extent that it requests information

regarding claims for nutritional counseling that were approved, and therefore are not at issue in

this litigation.

Subject to and without waiving its objections, Oxford responds that the total dollar

amount billed to Oxford for the claims referenced in Oxford's Response to Interrogatory No. 10

was ███████.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:

Subject to and without waiving its objections, Oxford responds that the total dollar

5

CONFIDENTIAL

amount billed to Oxford for the 1,360 denied claims was ▮▮▮▮▮. Oxford responds further

that the total dollar amount billed to Oxford for the 8,464 total claims was ▮▮▮▮▮▮

## INTERROGATORY NO. 15:

With respect to YOUR answer to Interrogatory No. 10, what is the total dollar amount of those claims that were potentially reimbursable by OXFORD?

## RESPONSE TO INTERROGATORY NO. 15:

Oxford objects to this Interrogatory as overbroad and irrelevant to the claims and

defenses in this case to the extent that it seeks information regarding claims for nutritional

counseling for the treatment of behavioral health conditions other than eating disorders, as

defined by the Interrogatories. Oxford further objects to this Interrogatory as overbroad and

irrelevant to the claims and defenses in this case to the extent that it requests information for

claims that were denied for reasons other than that nutritional counseling services for eating

disorders was not a covered benefit. Oxford further objects to this Interrogatory as overbroad and

irrelevant to the claims and defenses in this case to the extent that it requests information

regarding claims for nutritional counseling that were approved, and therefore are not at issue in

this litigation.

Subject to and without waiving its objections, Oxford responds that the estimated

potential reimbursement amount for the claims referenced in Oxford's Response to Interrogatory

No. 10 was approximately ▮▮▮▮▮. Oxford bases the potential reimbursement amount on the

average reimbursed amount for approved nutritional counseling claims for the treatment of

eating disorders with dates of service on and after January 1, 2021.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 15:

Subject to and without waiving its objections, Oxford responds that the estimated

potential reimbursement amount for the 1,360 denied claims was approximately ▮▮▮▮▮▮.

6

CONFIDENTIAL

Oxford bases the potential reimbursement amount on the average reimbursed amount for approved nutritional counseling claims for the treatment of eating disorders with dates of service on and after January 1, 2021.

## INTERROGATORY NO. 16:

With respect to YOUR answer to Interrogatory No. 10, what is the total dollar amount that was paid by OXFORD on those claims?

## RESPONSE TO INTERROGATORY NO. 16:

Oxford objects to this Interrogatory as overbroad and irrelevant to the claims and defenses in this case to the extent that it seeks information regarding claims for nutritional counseling for the treatment of behavioral health conditions other than eating disorders, as defined by the Interrogatories. Oxford further objects to this Interrogatory as overbroad and irrelevant to the claims and defenses in this case to the extent that it requests information for claims that were denied for reasons other than that nutritional counseling services for eating disorders was not a covered benefit. Oxford further objects to this Interrogatory as overbroad and irrelevant to the claims and defenses in this case to the extent that it requests information regarding claims for nutritional counseling that were approved, and therefore are not at issue in this litigation.

Subject to and without waiving its objections, Oxford responds that Oxford paid ██████ the claims referenced in Oxford's Response to Interrogatory No. 10 because they were not a covered benefit.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:

Subject to and without waiving its objections, Oxford responds that it paid ████████ for 6,004 approved claims out of the 8,464 total claims.

7

CONFIDENTIAL

**INTERROGATORY NO. 17:**

What was the total number of covered lives YOU insured, broken down by calendar year, from January 1, 2015 to the present? Covered lives means individuals enrolled in a health insurance plan and entitled to benefits with a given health insurance provider.

**RESPONSE TO INTERROGATORY NO. 17:**

Oxford objects to this Interrogatory as overbroad, unduly burdensome, and irrelevant to

the claims and defenses in this case because it requests information for members who did not

submit claims for nutritional counseling for eating disorders during the relevant time period.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

Subject to and without waiving these objections, Oxford responds that the total number of

individuals enrolled or participating in ERISA-governed health benefit plans issued or

administered by Oxford in New York are reflected in the chart below:

| FY15 | FY16 | FY17 | FY18 | FY19 | FY20 | FY21 | FY22 | FY23 |
|------|------|------|------|------|------|------|------|------|
| Dec  | Dec  | Dec  | Dec  | Dec  | Dec  | Dec  | Dec  | Aug  |
|      |      |      |      |      |      |      |      |      |

**INTERROGATORY NO. 20:**

With respect to the Time to Sue limitation, identify each and every NUTRITION COUNSELING benefit from November 30, 2015 through December 31, 2022 that required a claim to be filed.

**RESPONSE TO INTERROGATORY NO. 20:**

Oxford objects to this Interrogatory on the grounds that the phrases "NUTRITION

COUNSELING benefit" and "required a claim to be filed" are vague, ambiguous, and not

defined or explained. Oxford is unable to respond to this Interrogatory because it is unclear what

the Interrogatory requests.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

Subject to and without waiving these objections, Oxford responds that under its plans'

8

CONFIDENTIAL

terms, the requirement to file a claim does not vary based on any particular service or benefit.

Rather, under the terms of the governing health benefit plans, claims are required to be filed for

any service to be considered for reimbursement under the plan, for Oxford to make a benefit

determination under the plan, and as a prerequisite to bring a civil action under 502(a) of the

Employee Retirement Income Security Act (along with other requirements). *See, e.g.*, the Time

to Sue provisions in the produced form and sample COCs at OXF0001935-OXF0003821,

OXF0007705-OXF0015883, OXF0027093-27215, and OXF0028061-OXF0028061 (explaining

that no legal action may be brought against Oxford until after a claim has been filed). This claim

submission requirement applies to all requests for payment of plan benefits, irrespective of

whether the services in question are a covered benefit under the terms of the plan, whether

coverage is mandated by law, or whether the member or provider are seeking payment as an

exception to benefit coverage or other special accommodation.

## INTERROGATORY NO. 21:

From November 30, 2015 to the present, how many unique members received denial
letters or explanation of benefit forms citing the Time to Sue/two-year limitations provision in
denying NUTRITION COUNSELING claims?

## RESPONSE TO INTERROGATORY NO. 21:

Oxford objects to this Interrogatory as overbroad and unduly burdensome because it

requests information regarding the content of denial letters and explanation of benefits issued for

1,429 claims. In order to respond, Oxford would be required to conduct an unduly burdensome

investigation into each of the 1,429 claims to identify the correspondence associated with each

claim, and identify provisions reflecting time limitation periods. Oxford further objects to this

Interrogatory on the ground that the term "denial letters" is vague and ambiguous. Oxford also

objects to this Interrogatory as seeking information irrelevant to the claims and defenses in this

case because Oxford's citation to a particular contractual provision in a later communication

9

CONFIDENTIAL

does not have any bearing on its enforceability.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 21:

Subject to and without waiving these objections, Oxford further responds that the

explanation of benefits claims summary forms produced at OXF0019284 and OXF0019151

contain language regarding review and appeal rights that is representative of language that was

included in explanations of benefits summary forms from January 2018 through October 2020.

Those explanation of benefits documents that were issued to Plaintiff Molly C. and produced at

OXF0019284 and OXF0019151, and that are representative of language that was included in

explanations of benefits summary forms between January 2018 through October 2020, do not

separately reference the Time to Sue limitation.  Oxford will produce additional explanation of

benefits summary forms that are representative of those issued between November 2015 and

January 2018.

Oxford states that the Time to Sue limitation was disclosed and/or available to each

member enrolled in a plan offered or administered by Oxford in the form of the express written

terms of each member's health benefit plan. *See, e.g.*, the Time to Sue provisions in the produced

form and sample COCs at OXF0001935-OXF0003821, OXF0007705-OXF0015883,

OXF0027093-27215, and OXF0028061-OXF0028061.

## INTERROGATORY NO. 22:

From November 30, 2015 to the present, how many of YOUR health plans did not
contain a Time to Sue/two-year limitations provision?

## RESPONSE TO INTERROGATORY NO. 22:

Oxford objects to this Interrogatory as overbroad, unduly burdensome, and seeking

information irrelevant to the claims and defenses in this case to the extent that it requests

information regarding health plans that are not related to the nutritional counseling claims in this

CONFIDENTIAL

litigation. Oxford further objects to this Interrogatory as overbroad and unduly burdensome because it requests an analysis of each of Oxford's plans to prove a negative (i.e., that it "did not contain" a particular provision). In order to respond, Oxford would be required to conduct an unduly burdensome investigation into plan documents issued by Oxford over more than a five-year period.

Subject to and without waiving its objections, Oxford responds that the vast majority, if not all, of the fully insured plans at issue in this suit include the two-year contractual limitations period that appears in Ex. A to the Complaint. Oxford's form COCs, approved by New York Department of Financial Services ("DFS") for plan years 2015 through 2019, have the same two-year contractual limitations period that appears in Ex. A to the Complaint. The text states: "**Time to Sue**. No action at law or in equity may be maintained against Us prior to the expiration of 60 days after written submission of a claim has been furnished to Us as required in this Certificate. You must start any lawsuit against Us under this Certificate within two (2) years from the date the claim was required to be filed." Oxford's issued COCs for each plan year are required by law to be consistent with these DFS-approved form COCs, each of which includes a two-year contractual limitations period.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22:

Subject to and without waiving its objections, Oxford further responds that it produced the DFS-approved form COCs for plan years 2015 through 2019 at OXF0001935 - OXF0003821. Oxford also produced a sample set of COCs applicable to approximately 60 percent of all denied nutritional counseling claims with dates of service between November 30, 2015 and August 2, 2019 at OXF0007705-OXF0015883, OXF0027093-OXF0027215, and OXF0028061-OXF0028186. Based on Oxford's review of those DFS-approved template COCs,

11

as well as the sample set of COCs applicable to approximately 60 percent of all denied

nutritional counseling claims with dates of service between November 30, 2015 and August 2,

2019, Oxford is aware of only one ERISA-governed health benefit plan that did not include a

Time to Sue limitation, which is the health benefit plan applicable to Plaintiff Naomi L. for the

time period from October 1, 2018 to September 30, 2019 and which inadvertently excluded the

Time to Sue limitation as a result of an error. *See* OXF0026762.

## INTERROGATORY NO. 24:

Describe when and in what manner YOUR claim representatives were notified of the addition of NUTRITION COUNSELING benefits to OXFORD health plans.

## RESPONSE TO INTERROGATORY NO. 24:

Oxford objects to this Interrogatory on the grounds that the terms "claim representatives"

and "addition of NUTRITIONAL COUNSELING benefits" are vague and ambiguous. For

purposes of Oxford's response, it will construe "claim representatives" to mean Oxford's call

center team. Oxford also objects to this Interrogatory as irrelevant to the claims and defenses in

this case to the extent that it requests information unrelated to the Coverage Change.

Subject to and without waiving its objections, Oxford responds that Oxford's claim

representatives were notified of the Coverage Change during claim adjudication. The member

benefits would have reflected coverage of nutritional counseling for eating disorders for fully

insured members.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 24:

Subject to and without waiving its objections, and in accordance with Federal Rule of

Civil Procedure 33(d), Oxford further responds by referring Plaintiffs to the call center policies

and procedures for looking up benefits, which were produced at OXF0025279-OXF0025282,

OXF0025730-OXF0025732, OXF0026088-OXF0026091, OXF0026626-OXF0026628,

CONFIDENTIAL

OXF0026636-OXF0026639, OXF0028828-OXF0028829, OXF0028830-OXF0028831, and

OXF0028832-OXF0028833.


Dated: October 13, 2023

*/s/ Sarah M. Gilbert*
Sarah Michelle Gilbert
Christopher Flynn (*pro hac vice*)
Lauren Nunez (*pro hac vice*)


CROWELL & MORING LLP
590 Madison Avenue
20th Floor
New York, NY, 10022
Tel: (212) 895-4226
sgilbert@crowell.com
cflynn@crowell.com
lnunez@crowell.com

*Counsel for Oxford Health Insurance, Inc.*

13

CONFIDENTIAL

## **VERIFICATION**

The undersigned Lisa Gauthier, in her capacity as the former Claims Business Manager of Oxford, verifies that she has read the foregoing answers to interrogatories and that the answers are true and correct to the best of her knowledge and belief.

BY: _Lisa Gauthier_____

DATE: __October 13, 2023_____

14

CONFIDENTIAL

## CERTIFICATE OF SERVICE

      I hereby certify that, on this 13th day of October, 2023, I served a true and correct copy of the foregoing upon the following counsel via electronic mail:

Lisa S. Kantor, Esq.
Elizabeth K. Green, Esq.
Kantor & Kantor LLP
19839 Nordoff Street
Northridge, CA 91324
(818) 886-2525

Kathryn M. Trepinski, Esq.
Law Offices of Kathryn Trepinski
8840 Wilshire Boulevard, Suite 333
Beverly Hills, CA 90211
(310) 201-0022

                      /s/*Payal Nanavati*
                      Payal Nanavati

CONFIDENTIAL

# EXHIBIT D

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF NEW YORK

 3   _____

 4   MOLLY C. and NAOMI L.,          )

 5                   Plaintiffs,     )

 6   vs.                             ) Case No.

 7   OXFORD HEALTH INSURANCE,        ) 1:21-cv-010144-PGG

 8   INC.,                           )

 9                   Defendant.      )

10   _____

11

12     VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF

13                      FRANK FOX, PH.D.

14                 MONDAY, FEBRUARY 26, 2024

15                        9:01 A.M.

16                1200 SIXTH AVENUE, SUITE 610

17                   SEATTLE, WASHINGTON

18

19

20   Reported by:

21   Tami Lynn Vondran, CRR, RMR, CCR/CSR

22   WA CCR #2157; OR CSR #20-0477; CA CSR #14435

23   Job Number 6454731

24

25   PAGES 1 - 221
```

                                                    Page 1

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4             LISA S. KANTOR
               Kantor & Kantor LLP
 5             19839 Nordhoff Street
               Northridge, California 91324
 6             818.886.2525
               lkantor@kantorlaw.net
 7

 8             KATHRYN M. TREPINSKI -- via Zoom
               Law Offices of Kathryn Trepinski
 9             8840 Wilshire Boulevard, Suite 333
               Beverly Hills, California 90211
10             310.201.0022
               ktrepinski@trepinskilaw.com
11

12    FOR THE DEFENDANT:

13             ANDREW HOLMER
               Crowell & Moring LLP
14             515 South Flower Street, 40th Floor
15             Los Angeles, California 90071
               213.443.5509
16             aholmer@crowell.com
17

18             SAMUEL RUDDY -- via Zoom
19             Crowell & Moring LLP
20             1001 Pennsylvania Avenue, NW
21             Washington, DC 20004
               202.624.2564
22             sruddy@crowell.com
23

24    ALSO PRESENT:

25             ALAN MORGAN, Videographer
```

Page 2

```
1        A.   In response to what Mr. Petron alleged;        09:44:12

2   correct.

3        Q.   Right.                                          09:44:16

4             So is that uncertainty something that you --    09:44:16

5   sort of the -- are those confidence intervals and the

6   concept of uncertainty things that you considered when

7   you were forming your original report in December --

8   that was submitted in December of 2023?

9        A.   I've been retained as an expert in innumerable  09:44:40

10  cases.  And I've done a lot of academic research and

11  literature review, and not only academic literature, but

12  also survey research.  And based on my experience and

13  expertise, I wrote my declaration considering those

14  sorts of issues.

15            It was intended to be deliberately succinct.    09:44:58

16  It wasn't intended to be an expert report.

17       Q.   It was not intended to be -- so your            09:45:08

18  December 20, 2023, declaration was not intended to be an

19  expert report?

20       A.   As an expert who's been retained by             09:45:16

21  innumerable legal counsel, I draw a distinction between

22  a declaration and an expert report.

23       Q.   So what's your distinct -- can you elaborate    09:45:25

24  on what you view as the difference between an expert

25  declaration and an expert report?
```

Page 32

1          A.    A declaration is specifically focused on scope    09:45:34

2     and deliberately intended to be summary, and highly

3     succinct with key opinions included within but without a

4     significant enumeration.

5               On the other hand, in my expert opinion, an    09:45:54

6     expert report is going to be much more -- much more in

7     depth, much more support, much more analysis, much more

8     exploration of why I reached the conclusions I did, more

9     quantitative, more qualitative.

10              If a declaration is maybe four to six pages,    09:46:13

11    which is typically what they are -- I believe this one's

12    maybe eight -- an expert report, in my experience, would

13    be more like 40 to 80 pages.  They're different.

14         Q.    Okay.  So you think if you had done an expert    09:46:27

15    report in this case, it would have been somewhere in the

16    range of 40 to 80 pages?

17         A.    Based on my prior experience, yes.    09:46:34

18         Q.    And in that longer report, would you have gone    09:46:36

19    through the kinds of things that you go through, maybe

20    in a different way -- but the kinds of analysis you go

21    through in your supplemental declaration sort of

22    addressing the underlying issues, for example, of

23    uncertainty in the studies you relied on?

24              MS. KANTOR:  Objection.  Vague.  Calls for    09:46:58

25    speculation.

```
1    population of the proposed class can be determined from

2    the claims file alone; correct?

3              MS. KANTOR:  Claims data, you mean?          09:52:04

4              MR. HOLMER:  Yes.                            09:52:06

5         A.   Define the term "population."               09:52:11

6         Q.   (BY MR. HOLMER)  The group of people who, at 09:52:14

7    least for the study period, as you defined it, fall

8    within the scope of the proposed class.

9         A.   No, I wouldn't state that.                   09:52:25

10        Q.   It cannot be determined from the claim file  09:52:28

11   alone, in your opinion?

12        A.   Numerosity can be determined from the claims 09:52:31

13   file, which is what I established, which is what is

14   Oxford -- which is what Oxford also established in its

15   response to interrogatories.

16        Q.   But you disagreed with Mr. Petron's          09:52:45

17   conclusion, that it's not possible to estimate the

18   population of individuals within the proposed class from

19   the claim data without an individualized review of claim

20   files.

21             Why do you disagree with that opinion?       09:52:57

22        A.   My task, right from the outset, was to       09:53:03

23   estimate numerosity.  Numerosity doesn't have to be a

24   precise estimate of the, quote/unquote, population, or

25   the total number of insureds in the proposed class.
```

Page 37

1          Numerosity is a different constraint.  It's a          09:53:15

2   different definition, as I so state at the top of

3   page 3.  And it is my opinion that numerosity can be

4   established from the claims file.  But the entire

5   population of the proposed class can't be.

6          Q.   Why not?                                          09:53:28

7          A.   It's bigger than that.  Because during the        09:53:29

8   preponderance of the study period, for people with

9   eating disorders who sought nutritional counseling, that

10  was a denied benefit.  So I would expect a number of

11  those people who might have otherwise sought claims

12  coverage for the nutritional counseling, if they were

13  experiencing eating disorders, would have known it

14  wasn't a covered service, so therefore they wouldn't

15  have submitted a claim.

16         Q.   So --                                              09:53:56

17         A.   That scenario of uncertainty we just don't        09:53:57

18  know about.  But numerosity can certainly be established

19  from the claims file.

20         Q.   Okay.  So I want to break apart a couple           09:54:04

21  things.  And we'll -- that piece about why people might

22  not have submitted claims, we'll come back to.

23         But you -- what I understand you saying is            09:54:10

24  that estimating numerosity is sort of -- is distinct

25  from estimating a population; is that right?

Page 38

```
 1              In the case of knowing a population, that's a    09:56:51

 2   very different question.  That requires knowledge of the

 3   people who were insured by Oxford over the study period

 4   who suffered from an eating disorder and who sought

 5   nutritional counseling.  We don't know that number.

 6       Q.   Well, but it sounds to me like you're talking    09:57:08

 7   about the difference between knowing a population and

 8   estimating a population.

 9            MS. KANTOR:  Objection.  Mischaracterizes         09:57:18

10   testimony.

11       Q.   (BY MR. HOLMER)  Is that a fair statement?       09:57:21

12       A.   I would reiterate what I just said because it    09:57:27

13   felt to me like you were putting words in my mouth.

14       Q.   Okay.  Is it possible to estimate the           09:57:32

15   population of the class, the proposed class?

16       A.   It's possible to estimate the population, but    09:57:45

17   we don't know it, and that's different.  An estimate

18   versus a known population figure, that's quite

19   different.

20       Q.   Did you attempt to estimate the population of    09:57:57

21   the proposed class in this case?

22       A.   I estimated numerosity.  My estimates in my      09:58:05

23   declaration were an estimate of using reasonable

24   literature review, reasonable assumptions, and just

25   simple math to estimate the prevalence of the insureds
```

Page 41

```
 1    who would have suffered from an eating disorder, as well

 2    as the number who would have sought treatment, and then

 3    the number who would have sought not just treatment, but

 4    nutritional counseling treatment.

 5          That was an estimate of that insured segment    09:58:32

 6    of the insured population for Oxford.

 7      Q.   Okay.  And that is your estimate of          09:58:38

 8    numerosity, is your estimate of that segment of the

 9    insured population for Oxford?

10      A.   That would have been what was described in my  09:58:45

11    declaration.

12      Q.   Okay.  I want to go to page 4 of your report,  09:58:49

13    your supplemental declaration -- apologies --

14    Exhibit 14.

15          In the first paragraph, which is the paragraph  09:59:17

16    that continues from the prior page, you're

17    distinguishing some of the analysis that Mr. Petron did.

18          And then in the middle of the paragraph,        09:59:35

19    there's a sentence that reads, "This is not required."

20    So you're saying that something that Mr. Petron did was

21    not required.

22          And then you say, "These persons were denied    09:59:47

23    reimbursement for nutritional counseling because

24    nutritional counseling was not covered, which is all the

25    Class Definition requires."
```

Page 42

1    sufficient data?  Something along those lines.

2          MS. KANTOR:  Objection.  Asked and answered.    11:04:13

3      A.    I guess with respect to my declaration, which    11:04:21

4    was the first document I prepared, I don't do research

5    and analysis given the scope of the request with an

6    opinion in mind.

7          What I do is, I do what I consider research    11:04:32

8    and analysis, literature review, fact finding, if you

9    will, and build what I think are reasonable analytic

10   models that provide an estimate of numerosity, which is

11   what I did here.

12         And as I mentioned previously, my declaration    11:04:49

13   was deliberately succinct because that's what I thought

14   was necessary.  I expanded on those issues significantly

15   in my supplemental declaration, mainly to respond to

16   Petron's criticisms.

17     Q.    (BY MR. HOLMER)  So my question was slightly    11:05:18

18   different, which was:  Was there any work you considered

19   doing or any opinions you considered offering that you

20   couldn't because of a lack of information?

21     A.    No.  I think the answer would be the same, as    11:05:50

22   I previously stated.

23     Q.    Other than looking at the claims file, the    11:06:31

24   Excel spreadsheet, you didn't consider any of the named

25   Plaintiffs' medical records or insurance claims;

Page 81

1    correct?

2        A.    No, I did not.  I wasn't asked to.          11:06:42

3        Q.    Okay.  Let's look at -- let's go to page 1 of  11:06:48

4    your report.

5        A.    Which report are you referring to?          11:07:09

6        Q.    Sorry.  This is Exhibit 15, your initial     11:07:11

7    declaration.

8              Actually, let's jump to page 3.            11:07:20

9              So, again, this is the portion of your      11:07:34

10   declaration, beginning on page 3, where you estimate the

11   numerosity of the proposed class; correct?

12       A.    Correct.                                     11:07:45

13       Q.    Let's talk about sort of the steps in reaching  11:07:55

14   your opinion.

15             So you started your opinion with information   11:08:03

16   about the number of enrollees in Oxford Health Insurance

17   plans from 2015 to 2023; correct?

18       A.    Yes.                                         11:08:23

19       Q.    And that was information that was provided in   11:08:25

20   Oxford's interrogatory responses that you reviewed?

21       A.    Correct.  That's Table 1.                   11:08:32

22       Q.    And then from there, you took -- and I'm     11:08:39

23   looking at, now, page 4 of your report.

24             You took the assumed age and sex mix from U.S.  11:08:46

25   Census Bureau estimates for the state of New York over

                                                    Page 82

1    the 2015 to 2022 period; right?

2         A.   Correct.                                      11:08:59

3         Q.   And then you -- because data wasn't available  11:09:00

4    for 2023, you assumed the 2023 age-sex mix for the state

5    of New York was the same as 2022; right?

6         A.   Correct.                                      11:09:12

7         Q.   And then you assumed that the age-sex mix of   11:09:12

8    Oxford's enrollees matched the age-sex mix of New York

9    State as a whole over that time period; right?

10        A.   Correct.                                      11:09:26

11        Q.   Did you do anything to validate that last     11:09:26

12   assumption, that the age-sex mix of Oxford Health

13   Insurance enrollees were the same as the state of

14   New York, as a whole, for that time period?

15        A.   We didn't have the Oxford gender-age mix of    11:09:41

16   their insureds, so we used what I call a second-best

17   approach, which I consider reasonable and reliable.

18        Q.   But you didn't do anything to validate that    11:09:53

19   assumption; correct?

20        A.   I couldn't.  We didn't have the data.          11:09:56

21        Q.   And if the age-sex mix of Oxford health plans   11:10:02

22   were different than the overall age-sex mix of the state

23   of New York, that could significantly impact your

24   estimates; right?

25        A.   Well, that's a hypothetical I don't have the   11:10:18

                                                  Page 83

```
 1              MS. KANTOR:  I'm sorry.  Can you read it back?   11:11:56

 2   I got lost.

 3              (Last question read back.)                      11:12:24

 4       A.    The best information would have been that        11:12:26

 5   provided by Oxford.  But as I mentioned, we didn't

 6   receive that.

 7              In preparation of analyses similar to this, I   11:12:31

 8   typically rely on U.S. census data because it's very

 9   robust and statistically solid, in my opinion.  So it's

10   typically my second-best approach, which I almost always

11   use if there's no other better site-specific information

12   available.

13       Q.    (BY MR. HOLMER)  You understand that -- I        11:12:53

14   think we already mentioned it -- that this case involves

15   enrollees in what are called ERISA-governed health

16   benefit plans; right?

17       A.    Correct.                                         11:13:07

18       Q.    And do you know that that means, sort of         11:13:07

19   definitionally, that all of the people -- all of the

20   potential class members in this case are enrolled in an

21   employer-sponsored health plan?

22              Do you understand that?                         11:13:25

23       A.    Do I know that, or do I understand that?         11:13:26

24       Q.    Do you understand that?                          11:13:27

25       A.    I understood that, yes.                          11:13:28
```

Page 85

1   you relied on as cited in Table 3 of your declaration?

2       A.   That would be correct.                     11:47:05

3       Q.   And the table here, 2.3, in the Deloitte study  11:47:08

4   is titled "One-year prevalence (%) by condition, gender

5   and age, 2018-2019"; is that correct?

6       A.   Correct.                                   11:47:21

7       Q.   So your understanding is that this is a     11:47:22

8   calculation, or an estimate, of the one-year prevalence

9   of eating disorders nationally by gender and age bracket

10  from the years 2018 and 2019; is that right?

11      A.   So states.                                 11:47:43

12      Q.   Your study period is -- covers the years, at  11:47:53

13  least November 2015 through October or September of

14  2023; correct?

15      A.   Yes.                                       11:48:05

16      Q.   So these estimates here of the one-year     11:48:09

17  prevalence by gender and age for 2018 to 2019 capture

18  only a couple years of your study period; is that right?

19      A.   They're based on just a two-year period of  11:48:26

20  time.

21      Q.   Did you do anything to confirm that the     11:48:30

22  estimates in this table were -- for 2018 and 2019, were

23  reflective of the other seven years that were part of

24  your study period?

25      A.   In the course of the literature review that we  11:48:48

Page 97

1    would have undertaken, we did what I would consider a

2    comprehensive assessment of existing survey and academic

3    literature looking at prevalence rates for eating

4    disorders for these particular specific eating

5    disorders.

6          And at a first level, there just really aren't    11:49:12

7    very many of those kinds of analyses out there.  There

8    just aren't hardly any -- in fact, specifically with

9    this much specificity in them with sources -- that could

10   be supportable.

11         And so we did do an assessment, and although    11:49:31

12   not written up -- again, this would be in an expert

13   report -- we evaluated the reasonableness of these

14   estimates with other estimates that were out there.  And

15   this was the source of information we confirmed was the

16   most reasonable and reliable that we could access.

17         We would have done that comparison, not -- it    11:49:54

18   wasn't stated in the declaration, but we would have done

19   that comparison.  We just don't go and out and pick

20   things on a random basis.  We do literature review.

21   Q.   So were there other estimates of the one-year    11:50:07

22   prevalence of eating disorders that you didn't use and

23   you used Deloitte instead?

24   A.   I'm sure there are other sources of literature    11:50:18

25   because we evaluated a lot of literature to try and

Page 98

1      A.    -- and seemed reasonable and reliable.          12:27:04

2      Q.    And your understanding is that there were       12:27:07

3  no -- no new data inputs for that study post -- or after

4  the 2007 Ward data; right?

5      A.    I'd have to go back and reread the Ward study   12:27:23

6  to confirm my response to that.

7      Q.    But as you sit here, you're not aware of any?   12:27:28

8  For example --

9      A.    As I sit here, I don't remember.                12:27:31

10     Q.    For example, as you sit here and you read this  12:27:32

11 treatment appendix, the only study they cite is the 2007

12 Hudson study; right?

13     A.    I'm not going to read the whole treatment --    12:27:40

14 that whole appendix right now.

15     Q.    Did you do any analysis to -- for the purpose   12:27:56

16 of your report, to confirm that the national treatment

17 rates for eating disorders in 2007, as described in the

18 Ward study -- or in the Hudson study, were

19 representative of the treatment rates in the state of

20 New York for eating disorders for the years 2015 to

21 2023?

22     A.    As I stated previously, we did a detailed       12:28:28

23 literature review, looked at scientific articles, looked

24 at survey data.  That level of detail wasn't available

25 for the level of specificity that the scope of the

Page 121

1    request of me required.

2         However, we did see innumerable instances in    12:28:46

3    the literature review where, if anything, prevalence for

4    eating disorders was growing.  The usage of nutritional

5    counseling was growing.  The difficulty with the

6    literature is that it wasn't specific enough to

7    enumerate differences across the different types of

8    disorders, across the age cohorts, and across the

9    genders.

10         But clearly my -- the conclusion I read from    12:29:11

11    reading that literature was that prevalence has grown.

12    So, if anything, estimates from 2007 would be

13    underestimates of current prevalence anywhere, including

14    New York.

15         Q.   But those other studies that you just    12:29:26

16    articulated, you didn't rely on them, correct, because

17    you didn't cite them in your report?

18         A.   That's correct.    12:29:34

19         Q.   Okay.  So those -- what you just described    12:29:35

20    doesn't actually form the basis of any of your opinions?

21         A.   Well, the basis of my opinions are driven by    12:29:45

22    the analytic research that we did.  The ones -- the

23    research that we did and the analysis we did that we

24    relied upon is stated in the declaration and

25    supplemental declaration.

                                                Page 122

```
 1        Q.   And that's contrasted to, for example, a        14:51:48
 2   random sample where people are randomly selected, sort
 3   of irrespective of their interest in the subject; is
 4   that right?
 5        A.   They're different.                               14:51:59
 6        Q.   And applying the results of this survey, did     14:52:01
 7   you try to account for any self-selection bias and
 8   clinicians who responded to this survey?
 9        A.   No, I didn't.                                    14:52:12
10        Q.   Did you do anything to evaluate whether the      14:52:13
11   incidence of eating disorders in Australia is similar to
12   the incidence of eating disorders in the state of
13   New York?
14        A.   No, I did not.                                   14:52:32
15        Q.   Did you do anything to validate whether the      14:52:34
16   treatment rates for eating disorders in Australia are
17   similar to treatment rates for eating disorders in the
18   state of New York?
19        A.   I didn't assess treatment rates in Australia.    14:52:51
20   I didn't use that.
21             (Simultaneous crosstalk.)
22             (Court reporter clarification.)
23        Q.   (BY MR. HOLMER) Did you do anything to           14:52:59
24   validate whether the utilization of nutritional
25   counseling for the treatment of eating disorders
```

Page 167

1   specifically is similar in Australia as in the state of

2   New York?

3        A.   In my opinion, the Australian study was a          14:53:26

4   reasonable study.  And given the paucity of other

5   alternative analysis, it was appropriate to use for the

6   study that I needed to undertake for numerosity.

7             And I've since explained, in my supplemental      14:53:47

8   declaration, why it is reasonable in retrospect, again,

9   in response to Petron's specific criticism about my use

10  of this study.

11       Q.   So, again, your -- if I'm understanding you       14:54:00

12  correctly, this sort of goes back to the issue we

13  discussed before about the difference between

14  calculating numerosity and, for example, preparing a

15  damages model; right?

16       A.   Yes.                                               14:54:22

17       Q.   So if you were doing more than just               14:54:24

18  calculating numerosity, you may have tried to account

19  for, for example, variations in treatment patterns in

20  New Zealand and the United States?

21            MS. KANTOR:  Objection.  Calls for                14:54:37

22  speculation.

23       A.   A damages model would have been much more         14:54:41

24  comprehensive and it would have been much more in depth,

25  and I would have explained precisely why I used one

Page 168

# EXHIBIT E

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1                UNITED STATES DISTRICT COURT
 2               SOUTHERN DISTRICT OF NEW YORK
 3
 4
 5     MOLLY C. AND NAOMI L., ON BEHALF OF    )
       THEMSELVES AND ALL OTHERS             )
 6     SIMILARLY SITUATED,                    )  CASE NO.
                                              )  1:21-CV-10144-
 7                     PLAINTIFFS,            )  PGG
                                              )
 8              VS.                           )
                                              )
 9     OXFORD HEALTH INSURANCE, INC.,         )
                                              )
10                     DEFENDANT.            )
       _____)
11
12
13        (THE FOLLOWING PAGES CONTAIN CONFIDENTIAL MATERIAL
14               SUBJECT TO PROTECTIVE ORDER.)
15
16           VIDEOTAPED DEPOSITION OF LISA GAUTHIER
17               WEDNESDAY, NOVEMBER 29, 2023
18
19
20     REMOTE PROCEEDING
21     WITNESS LOCATION:  NASHUA, NEW HAMPSHIRE
22
23     REPORTED REMOTELY BY:  SUSAN S. HENRIQUEZ, CERTIFIED
       SHORTHAND REPORTER NO. 13763
24
25     JOB NO. 6324483
```

                                                    Page 1

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

```
 1              THE WITNESS:  The reporting team has

 2     diagnosis in their data dictionary.

 3     BY MS. TREPINSKI:

 4         Q   And what does that mean?

 5         A   It means diagnosis is a reportable field.    03:23:13

 6         Q   So if it's a reportable field, then a report

 7     can be generated; is that what you're saying?

 8         A   If a field is reportable, it can be an output

 9     on a report requested, yes.

10         Q   Okay.  Okay.  So -- now, maybe I asked you     03:23:32

11     this before, and forgive me if I did, but why was

12     Pulse retired?

13         A   I would be speculating on the reason why.

14         Q   What's your best understanding?

15         A   My understanding is that United Healthcare    03:24:14

16     went to an enterprise claim adjudication engine called

17     Cirrus.

18         Q   And what does that mean -- what do you mean

19     by "enterprise"?

20         A   Meaning that other books of business, aside   03:24:32

21     from Oxford or in addition to Oxford, could be

22     adjudicated on the Cirrus claim adjudication system.

23         Q   Would that be, say, an ASO policy?

24         A   When you're adjudicating claims --

25              MR. HOLMER:  Vague.                           03:24:56
```

Page 74

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1       Q   And what do you mean in that answer by the

2   word "populates"?

3       A   "Presents" might be a better word.

4       Q   Is it an input?  Is it the same thing as an

5   input?                                          04:43:30

6       A   It's behind the scenes, the rules or this

7   logic -- I'm trying to think of the word -- triggers

8   or populates, presents, the result of that rule.

9       Q   Okay.  Moving on (as read):

10      ███████████████████████████    ███████████

    ██  ████████████████████████████████████

    ██  ████████████████████████████████

    ██  ████████████████████████████████████

    ██  ████████████████████████████████████

    ██  ████████████████████████████████████    ████████

    ██  ██████████████████████████████████

    ██  █████████████████████████

18      A   It is.

19      Q   And what do you mean by the phrase

20  auto-adjudicated in this sentence?              04:44:23

21      A   Auto-adjudication means there was no manual

22  intervention to pay or deny the claim.

23      Q   So does that mean, like, no human was

24  involved in the coverage determination?

25      A   Correct.                                04:44:44

                                                Page 89

# EXHIBIT F



Rea v. Blue Shield of California – 0885
PO Box 44
Minneapolis, MN 55440-0044

## IMPORTANT LEGAL MATERIALS

- UAA <<SequenceNo>>

<<Name1>>
<<Name2>>
<<Name3>>
<<Name4>>
<<Address1>>
<<Address2>>
<<City>> <<State>> <<Zip10>>
<<CountryName>>

### SUPERIOR COURT FOR THE STATE OF CALIFORNIA
### FOR THE COUNTY OF LOS ANGELES

**If you were covered under a Blue Shield of California non-ERISA health plan during the period September 2, 2007 through December 31, 2015 and were denied authorization or reimbursement for residential treatment of anorexia nervosa or bulimia nervosa on the grounds that your plan did not provide coverage for residential treatment, a Court has held that Blue Shield was not permitted to rely on the residential treatment exclusion.**

*A California court authorized this notice. You are not being sued. This is not a solicitation from a lawyer.*

- A member of a Blue Shield of California health plan has sued Blue Shield alleging that it improperly denied requests for authorization or reimbursement for residential treatment for anorexia nervosa and bulimia nervosa on the grounds that Blue Shield's plans did not provide coverage for residential treatment.

- The Court allowed the lawsuit to proceed as a class action on behalf of all persons who were covered under a Blue Shield non-ERISA health plan during the period between September 2, 2007 and December 31, 2015 and who were denied authorization or reimbursement for residential treatment of anorexia nervosa or bulimia nervosa on the grounds that their plan did not provide coverage for residential treatment.

- The lawsuit sought to determine whether Blue Shield could apply the residential treatment exclusion in its plans to persons with anorexia nervosa or bulimia nervosa.

- On May 23, 2019, the Court issued an Order holding that **"Blue Shield's residential treatment exclusion violated California's Mental Health Parity Act as applied to persons suffering from anorexia nervosa or bulimia nervosa. Blue Shield may not rely on that unlawful exclusion to refuse to reimburse any new or resubmitted claim for medically necessary residential treatment of any class member's anorexia nervosa or bulimia nervosa."**

### Please read this notice carefully.

| 1. | Why did I get this notice? |
|---|---|

According to Blue Shield's records, you were covered under a Blue Shield non-ERISA health plan during the period September 2, 2007 to December 31, 2015 and requested authorization or submitted a claim for treatment for anorexia nervosa or bulimia nervosa at the inpatient, partial hospitalization, intensive outpatient or outpatient level of care.

You are a member of this Class if you, or someone on your behalf, requested authorization for or submitted a claim for reimbursement for residential treatment for anorexia nervosa or bulimia nervosa, and were told by Blue Shield that residential treatment was not covered by your health plan. Because Blue Shield cannot readily identify all requests and claims for residential treatment, this Notice is being sent to everyone who requested treatment for anorexia nervosa or bulimia nervosa at the inpatient, partial hospitalization, intensive outpatient, or outpatient level of care. If you did not request authorization

or submit a claim for residential treatment for anorexia nervosa or bulimia nervosa during the period of September 2, 2007 to December 31, 2015, you are not a member of the Class and you may disregard this Notice.

Judge Amy D. Hogue of the Los Angeles County Superior Court is overseeing this lawsuit and the case is known as *Rea v. Blue Shield of California*, Case No. BC 468900, Los Angeles Superior Court.

| **2.** | **What does the Court's May 23, 2019 Order mean?** |
| --- | --- |

The Court did not make a determination that any member of the Class is entitled to benefits or compensation. The Court only determined that Blue Shield was not permitted to rely on the residential treatment exclusion in its plans to deny authorization or reimbursement to Class members for claims for medically necessary residential treatment of anorexia nervosa or bulimia nervosa. There may be other reasons why a claim is not payable in whole or in part.

You may submit or resubmit to Blue Shield any claims you may have for reimbursement for residential treatment that you received while a Blue Shield member between September 2, 2007 and December 31, 2015 for anorexia nervosa or bulimia nervosa if Blue Shield denied authorization or reimbursement on the grounds that your plan did not provide coverage for residential treatment. Blue Shield may not rely on any residential treatment exclusion to refuse to reimburse any new or resubmitted claim by a Class member for medically necessary residential treatment of anorexia nervosa or bulimia nervosa.

If you would like to submit a new claim or resubmit a previously denied claim for reimbursement for residential treatment that you received while a Blue Shield member between September 2, 2007 and December 31, 2015 for anorexia nervosa or bulimia nervosa where Blue Shield denied authorization or reimbursement on the grounds that your plan did not provide coverage for residential treatment, you must submit the enclosed Claim Form by **September 1, 2020** to the following address:

Blue Shield of California
PO Box 272650
Chico, CA 95927

| **3.** | **Do I have a lawyer in this case?** |
| --- | --- |

Yes. The Court appointed the following attorneys as Class Counsel:

| | |
| --- | --- |
| Kathryn M. Trepinski | Lisa S. Kantor |
| Law Offices of Kathryn Trepinski, ALC | Kantor & Kantor, LLP |
| 8840 Wilshire Blvd., Suite 333 | 19839 Nordhoff Street |
| Beverly Hills, CA 90211 | Northridge, CA 91234 |
| T: (310) 201-0022 | T: (818) 886-2525 |
| www.trepinskilaw.com | www.kantorlaw.net |

You will not be charged for these lawyers. If you want to be represented by your own lawyer, you may hire one at your own expense.

| **4.** | **How will the lawyers get paid?** |
| --- | --- |

Class Counsel will file a motion with the Court asking the Court to award them attorneys' fees and expenses up to $10 million and for a service award of $15,000 to the Class Representative, Marissa Rea. The fees and expenses are to pay Class Counsel for their time and costs in investigating the facts, litigating the case, and negotiating this notice. Blue Shield will oppose the requested amount of attorneys' fees and expenses. The Court will decide the motion and may award less than the requested amounts. The amounts awarded will not reduce the benefits potentially available to Class members who submit or resubmit a claim as provided under Question 2 above.

Following the Court's ruling on Class Counsel's motion for approval of attorneys' fees and expenses and request for a service award for the Class Representative, Class Counsel will move the Court to enter a declaratory judgment in favor of the Class tracking the declaration in the Court's May 23, 2019 Order, and setting forth the amount of attorneys' fees, expenses and any service award that the Court awards. The entry of judgment will bring this lawsuit to an end. This is the last notice you will receive about this lawsuit.

| **5.** | **How do I get more information?** |
|---|---|

Additional information about this lawsuit, including copies of Plaintiffs' Third Amended Complaint, Blue Shield's Answer, the Court's Order Granting in Part and Denying in Part Class Certification, and the Court's May 23, 2019 Order Denying Plaintiffs' Motion for Summary Judgment and Granting in Part Plaintiffs' Motion for Summary Adjudication, is available on the internet at: **www.EDRTCclass.com**

Any questions you have concerning this Notice should be directed to the Notice Administrator at 1-877-310-0490. The Notice Administrator will not reveal your identity without your knowledge and consent.

If you have any questions about the enclosed Claim Form, or need an additional form, please contact Blue Shield at (888) 659-6062.

You may also direct any questions you have concerning this Notice or the attached Claim Form to Class Counsel identified in Question 3 above, without disclosing your identify unless you choose to do so.

### DO NOT CALL THE COURT.

Copies of the pleadings, order and other documents filed in this litigation may be examined and copied at any time during regular office hours at:

Clerk of the Court, Spring Street Courthouse
312 N. Spring Street
Los Angeles, CA 90012

You may also contact Class Counsel, identified at Question 3 above.

If you choose to go to the Courthouse, note that all persons entering the Courthouse will undergo a security check similar to what you experience at an airport. Please bring a current form of identification with you.

| **6.** | **What are the important dates and deadlines relating to this notice?** |
|---|---|

| **Deadline** | **Event** |
|---|---|
| **September 1, 2020** | **Deadline to submit Claim Form to Blue Shield** |
| **October 13, 2020** | **Hearing on Class Counsel's motion for approval of attorneys' fees and costs and request for a service award for the Class Representative.** |

Dated: <u>February 20, 2020</u>        <u>s/Honorable Amy D. Hogue</u>

Los Angeles Superior Court Judge

**REA V. BLUE SHIELD OF CALIFORNIA**

**CLAIM FORM FOR PREVIOUSLY-DENIED CLAIMS OR AUTHORIZATION REQUESTS
(RESIDENTIAL TREATMENT FOR ANOREXIA NERVOSA OR BULIMIA NERVOSA)**

You are receiving this Claim Form because you may be a Class member in the case captioned *Rea v. Blue Shield of California, Case No. BC 468900, Los Angeles Superior Court*. You are a member of this Class if you (or someone on your behalf) requested authorization from or submitted a claim for reimbursement under your Blue Shield of California ("Blue Shield") health plan for residential treatment for anorexia nervosa or bulimia nervosa between September 2, 2007 and December 31, 2015, and you (or the person acting on your behalf) were told by Blue Shield that residential treatment was not covered by your health plan. If you received the requested residential treatment despite Blue Shield's denial, you may complete this Claim Form in order to be eligible for review and potential payment of your claim.

This Claim Form is being sent to everyone who requested authorization from or submitted a claim for reimbursement under your Blue Shield of California health plan for treatment for anorexia nervosa or bulimia nervosa at the inpatient, residential treatment, partial hospitalization, intensive outpatient, or outpatient level of care. If you did not request authorization from or submit a claim to Blue Shield for residential treatment for anorexia nervosa or bulimia nervosa during the period of September 2, 2007 to December 31, 2015, you are <u>not</u> a member of the Class and should not submit this Claim Form.

If you <u>are</u> a member of the Class and submit a complete Claim Form, Blue Shield of California will review your claim in accordance with its normal procedures to determine if residential treatment was medically necessary for treatment of your anorexia nervosa or bulimia nervosa. All of the terms of your health plan in effect at the time you received residential treatment will apply, except for the residential treatment exclusion. If you submit a Claim Form without adequate supporting medical records, Blue Shield will request medical records from the residential treatment facility you identify in Part 6, below, and will review your claim once the medical records are received. If Blue Shield does not receive the medical records from the residential treatment facility, your claim may be denied for lack of supporting documentation. Your claim may be denied for other reasons, or payment may be reduced if you did not reach your out-of-pocket maximum and applicable deductibles or copayments/coinsurance would have applied at the time.

If you have any questions about this form, or need an additional form, please contact Blue Shield at (888) 659-6062.

Submitting this Claim Form does not guarantee that you will receive benefits or payment. If you are not satisfied with Blue Shield's determination of your claim, Blue Shield's response to your claim will provide notice of your appeal rights.

**Instructions:**

Please read all of the instructions and complete the Claim Form as indicated below. You must submit the completed Claim Form to Blue Shield of California by **September 1, 2020** in order to be eligible for payment.

For your protection, California law requires the following to appear on this form: Any person who knowingly presents a false or fraudulent reimbursement for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

To avoid any delay in processing your request, please be sure to answer each question completely, and provide as much information as possible. When you have completed this Claim Form, please mail it–along with all supporting documentation–directly to Blue Shield at the address listed below:

Blue Shield of California, PO Box 272650, Chico, CA 95927

| ARE YOU PART OF THE CLASS? |
|---|

**Did you, or someone on your behalf, request authorization from or submit a claim for reimbursement under your Blue Shield of California health plan for residential treatment for anorexia nervosa or bulimia nervosa between September 2, 2007 and December 31, 2015? If so, were you or the person acting on your behalf told by Blue Shield that residential treatment was not covered by your health plan?**

☐ I, or someone on my behalf, submitted a claim that was denied because residential treatment was not a benefit of my plan. *(Please proceed to Part 1, below.)*

☐ I/someone on my behalf requested authorization, and was told that residential treatment was not a benefit of my health plan. *(Please proceed to Part 2, below.)*

☐ No. *(You are not a member of the class, and should not submit this Claim Form.)*

**PART 1 – CLASS MEMBERS WITH PREVIOUSLY-DENIED CLAIMS**

**1(a):** **When did you/someone on your behalf submit a claim to Blue Shield of California for coverage of residential treatment for anorexia or bulimia?**

Date: _____

**1(b):** **When did Blue Shield of California deny your claim?**

Date: _____

**1(c):** **What was Blue Shield of California's stated reason for the denial?**

☐ Residential treatment is not a benefit of the plan.

☐ Blue Shield of California denied my claim for a different reason, such as lack of medical necessity or because I was no longer a member *(if Blue Shield denied your request for a different reason, you are not a member of the class and should not submit this Claim Form).*

☐ Blue Shield of California paid the claim *(if Blue Shield paid the claim, you are not a member of the class and should not submit this Claim Form).*

☐ Other (please explain): _____

**1(d):** **Did you (or a family member) pay for the denied residential treatment?**

☐ Yes.

☐ No, but the residential treatment facility is currently seeking payment for the denied claim.

☐ No, but I owe the residential treatment facility for my treatment.

☐ No.

**REQUIRED DOCUMENTS:** *Please submit as many of the following documents as you can with this Claim Form to enable Blue Shield of California to evaluate whether the services you received were medically necessary and otherwise covered under your health plan, as well as to determine the amount of reimbursement you may receive through this process. To ensure proper processing, please provide the following documents:*

- The claim for residential treatment previously submitted to Blue Shield of California.

- All available medical records for the residential treatment you received.

- The explanation of benefits denying the claim on the ground that residential treatment was not a benefit of your plan.

- Invoice/billing statements reflecting the name and location of the residential treatment facility, the services provided, billed amount, and dates of service.

- Proof of payment to the residential treatment facility (canceled check, receipt, or credit card/bank statement).

- Documentation showing whether the residential treatment facility wrote off any charges or accepted your payment as payment in full.

- If you have not paid for the residential treatment, please submit the most recent bill or collection notice you received.

- If benefits were provided by another health plan or health insurance company, please provide the Explanation of Benefits you received from that health plan or insurance company.

*(Please proceed to Part 3 of this Claim Form, complete Parts 3, 4, 5, and 6, and sign the form.)*

| PART 2 – CLASS MEMBERS WHO REQUESTED AUTHORIZATION FOR RESIDENTIAL TREATMENT |
|---|

**2(a): Who requested authorization from Blue Shield of California for coverage of residential treatment for your anorexia or bulimia?**

☐ Me.

☐ A friend or family member (name): _____

☐ A doctor or other health care provider/facility (name): _____

**2(b): How was the request for authorization communicated to Blue Shield of California?**

☐ In writing.

☐ Telephone call.

☐ Other (please explain): _____

**2(c): When was the authorization request communicated to Blue Shield of California?** Date: _____

**2(d): When did Blue Shield of California respond to the authorization request?** Date:_____

**2(e): How did Blue Shield of California respond to the request for authorization for you to receive residential treatment for anorexia or bulimia?**

☐ I received a written response that residential treatment was not a benefit of my plan.

☐ I received a verbal response that residential treatment was not a benefit of my plan.

☐ Blue Shield of California denied my request for a different reason, such as lack of medical necessity or because I was no longer a member *(if Blue Shield denied your request for a different reason, you are not a member of the class and should not submit this Claim Form).*

☐ Blue Shield of California authorized me to receive residential treatment (if Blue Shield authorized your request, you are not a member of the class and should not submit this Claim Form).

☐ Other (please explain): _____

**2(f): If Blue Shield of California told you that residential treatment was not a benefit of your plan, did you receive the requested residential treatment anyway?**

☐ Yes.

☐ No *(if you did not receive the requested residential treatment, you should not submit this Claim Form).*

**2(g): If the answer to Question 2(f) is "yes," did you pay for the residential treatment?**

☐ Yes, I have paid for the residential treatment.

☐ No, but the residential treatment facility is currently seeking payment.

☐ No, but I owe the residential treatment facility for my treatment.

☐ No.

**REQUIRED DOCUMENTS:** Please submit as many of the following documents as possible with this Claim Form to enable Blue Shield of California to evaluate whether the services you received were medically necessary and otherwise covered under your health plan, as well as to determine the amount of reimbursement you may receive through this process. To ensure proper processing, please provide the following documents:

- The authorization request for residential treatment that was previously submitted to Blue Shield of California, or records you or your provider kept regarding a telephonic authorization request.

- Any response from Blue Shield of California to your authorization request.

- All available medical records for the residential treatment you received.

- Invoice/billing statements reflecting the name and location of the residential treatment facility, the services provided, billed amount, and dates of service.

- Proof of payment to the residential treatment facility (canceled check, receipt or credit card/bank statement).

**(CONTINUED ON NEXT PAGE)**

- Documentation showing whether the residential treatment facility wrote off any charges or accepted your payment as payment in full.
- If you have not paid for the residential treatment, please submit the most recent bill or collection notice you received.
- If benefits were provided by another health plan or health insurance company, please provide the Explanation of Benefits you received from that health plan or insurance company.

*Please complete the remainder of this Claim Form and sign it.*

| PART 3 - CLASS MEMBER INFORMATION |
| --- |

| Patient's Last Name | First | Middle |
| --- | --- | --- |
| Name at time of residential treatment, if different | | |

| Home Address | | Date of Birth (Mo / Day / Yr) | Primary Phone Number |
| --- | --- | --- | --- |
| City | State | Zip | Patient Sex | Is this a new address?<br>☐ Yes  ☐ No |

Blue Shield Member ID No. at time of residential treatment

| PART 4 - OTHER COVERAGE OR BENEFITS INFORMATION |
| --- |

| Have you received coverage or benefits from any other health plan or health insurance company for the residential treatment?<br><br>☐ Yes  ☐ No | If you were enrolled in Medicare when you received the residential treatment, please indicate which parts you were enrolled in at the time:<br><br>☐ Part A  ☐ Part B |
| --- | --- |
| If the answer is "Yes" to the above, what dates were you enrolled?<br><br>Effective Date:<br>End Date: | If you were enrolled in Medicare, what dates were you enrolled?<br><br>Effective Date:<br>End Date: |

| Name of other health plan or insurance company: | | Policy No. / Subscriber No. | |
| --- | --- | --- | --- |
| Other health plan or insurance company address | City | State | Zip |
| Name of policyholder | | Social Security No. | Date of Birth |
| (For Group Coverage) Employer Name | (For Group Coverage) Employer Address | City | State | Zip |

* B A R C O D E 3 9 *

### PART 5 - AUTHORIZATION TO OBTAIN AND RELEASE MEDICAL INFORMATION

I hereby authorize any physician, health care practitioner, hospital, clinic, or other medically related facility to furnish to Blue Shield of California, its agents, designees, or representatives, any and all information pertaining to mental health and/or medical treatment for purposes of reviewing, investigating, or evaluating applications or claims. I also authorize Blue Shield, its agents, designees, or representatives to disclose to a hospital, health care provider, or health care service plan, insurer, or self-insurer any such mental health and medical information obtained if such disclosure is necessary to allow the processing of any claim.

If my coverage was under a Group Benefit Agreement held by my employer, an association, trust fund, union, or similar entity, this authorization also permits disclosure to them to the extent necessary for utilization review or financial audit purposes.

This authorization becomes effective immediately and will remain in effect until December 1, 2020.

A photocopy or scan of this authorization will be considered as effective and valid as the original.

I certify that the above statements are correct.

| BLUE SHIELD MEMBER, OR PARENT OR LEGAL GUARDIAN'S SIGNATURE (if Member is under 18 years old) | PRINT NAME | DATE |
|---|---|---|
| | | |

### PART 6 - RESIDENTIAL TREATMENT FOR WHICH YOU ARE REQUESTING REVIEW AND PAYMENT

| Dates of Service | Residential Treatment Facility | Location | Total Charge For Services | Amount You Paid (If Any) | Additional Amount Provider is Seeking (If Any) |
|---|---|---|---|---|---|
| *Example 6/1-6/30/2014* | *XYZ Residential Center* | *123 Smith St., Los Angeles, CA* | *$10,000* | *$3,000* | *$0* |
| 1. | | | | | |
| 2. | | | | | |

*(If you need more space, please provide more information on a continuation page.)*

**I UNDERSTAND THAT ANY INFORMATION I PROVIDE TO MY HEALTH PLAN MUST BE TRUE AND HEREBY CERTIFY THAT THE FOREGOING IS TRUE, CORRECT, AND COMPLETE TO THE BEST OF MY KNOWLEDGE.**

| BLUE SHIELD MEMBER, OR PARENT OR LEGAL GUARDIAN'S SIGNATURE (if Member is under 18 years old) | DATE |
|---|---|
| | |